## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MONTE SWENSON, WILBUR PACE,           )
NOAH PACE, CHRISTOPHER PACE,          )
LOUISE LARGE-GURIN, ELIZABETH         )
KANTOR, ROYAL ALVIS, JR., ANN ENGLES,)
KIMBERLY ROSARIO, JESS HARRIS         )
III and SUSAN REED as TRUSTEES for the )
THE HARRIS FAMILY IRREVOCABLE         )
LIFE INSURANCE TRUST, NATALIE C.      )
MACKIE as TRUSTEE for TRUST UTD       )
12/28/1993, MICHAIL KERHOULAS, LOUISA )
KERHOULAS, and LAURA WHEELER,         )
                                      )
        Plaintiffs,                  )
                                      )   Civil Action No.
    v.                            )   1:17-cv-04843-PKC
                                      )
VOYA RETIREMENT INSURANCE             )
& ANNUITY CO., VOYA FINANCIAL,        )
INC., LINCOLN LIFE & ANNUITY          )
CO. OF NEW YORK, LINCOLN              )
NATIONAL LIFE INSURANCE CO.,          )
LINCOLN NATIONAL CORP.                )
                                      )
        Defendants.                  )

## SECOND AMENDED COMPLAINT

INTRODUCTION ..................................................................................................... 1

II.     PARTIES ....................................................................................................... 6

     A.     Defendants and their Affiliation ........................................................... 6

     B.     The Plaintiff Policyholders .................................................................. 7

III.    JURISDICTION AND VENUE ..................................................................... 8

IV.    FACTS ......................................................................................................... 9

     A.     General Background Allegations .......................................................... 9

           1.     Voya's Relationship with Lincoln .......................................... 9

           2.     Voya's Troubled History ...................................................... 12

           3.     Lincoln's Troubled Financial Status Leads to Acceptance of TARP Funds ......................................................................... 14

           4.     The Captive Reinsurance Scheme ......................................... 15

                a.     *Accurate Reporting of Surplus and RBC under NAIC SAP is required* .............................................................. 15

                b.     *Two main ways insurance companies are measured for ability to meet long-term obligations: surplus and risk-based capital* ...................................................................... 16

                      i.   Surplus as a measure of solvency ............................... 16

                      ii.  RBC as a measure of ability to meet future obligations ................................................................. 17

                c.     *Transactions with affiliates can manipulate surplus and RBC* ........................................................................ 18

                d.     *The Use of Wholly-Owned Captives* ........................... 18

     B.     Defendants' Captive Insurance Scheme ............................................ 21

           1.     Voya's Captive Reinsurance Scheme .................................... 21

           2.     Lincoln's Captive Reinsurance Scheme ................................ 24

C.    Defendants Move Policyholders to the End of the Line, Putting Investors Ahead of Them to Receive Excessive Stockholder Dividends ................................................................................27

      1.    Voya's Payment of Dividends to Voya Financial ................................27

      2.    Lincoln National Life's Payment of Dividends to Lincoln National Corp. .................................................................................28

D.    Defendants' COI Increase ..........................................................................30

      1.    Lincoln and Voya's Special Relationship Regarding the Life Policies at Issue ..................................................................................30

      2.    Overview of Life Policies at Issue ....................................................33

      3.    Lincoln Sends Annual Reports Indicating the Voya Policies Are Adequately Funded and Minimal Fees Are Charged .............................35

      4.    Defendants Implement Drastic COI Increases to Generate Cash and Cause Lapse ...............................................................................36

      5.    Defendants Misrepresent the True Reasons Behind the COI Increase ..........................................................................................37

E.    Universal Policies at Issue .........................................................................39

      1.    Plaintiff Monte Swenson ....................................................................40

      2.    Plaintiff Wilbur Pace .........................................................................40

      3.    Plaintiffs Noah and Christopher Pace ................................................41

      4.    Plaintiff Louise Large-Gurin .............................................................42

      5.    Plaintiff Elizabeth Kantor ..................................................................43

      6.    Plaintiffs Royal Alvis, Jr., Ann Engles, and Kimberly Rosario ...........43

      7.    Plaintiffs Jess Harris III and Susan Reed as trustees for The Harris Family Irrevocable Life Insurance Trust Plaintiff ...........................43

      8.    Plaintiff Natalie C. Mackie, as trustee for Trust UTD 12/28/1993 .......44

      9.    Plaintiffs Michail and Louisa Kerhoulas ...........................................44

10.    Plaintiff Laura Wheeler…………………………………………….. 44

11.    Impact on Plaintiffs' Policies ................................................45

F.   Defendants' Publicly Filed Financial Statements Demonstrate that the Defendants Justifications to Raise COI Rates Are Untrue ...............................45

V.    RICO ALLEGATIONS ........................................................................51

A.    Standing, Injury, and Proximate Cause ........................................51

B.    The Alleged Association-in-Fact RICO Enterprise ...........................52

1.    Purpose of the RICO Enterprise .............................................54

2.    Relationships Among Separate and Distinct Associates .....................54

3.    Continuous Existence ........................................................57

4.    Interstate Commerce ........................................................58

C.    Pattern of Racketeering Activity ..............................................58

D.    Predicate Acts ................................................................59

VII.   COUNTS ...............................................................................62

COUNT ONE VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION 1962(c)...............................................................................62

COUNT TWO VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION 1962(d)...............................................................................62

COUNT THREE BREACH OF CONTRACT................................................63

COUNT FOUR UNJUST ENRICHMENT................................................65

COUNT FIVE CONVERSION................................................66

COUNT SIX FRAUD ................................................67

COUNT SEVEN VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ................................................................................69

COUNT EIGHT VIOLATION OF NEW YORK DECEPTIVE ACTS AND PRACTICES ACT...........................................................................................72

COUNT NINE VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT ......................................................................................................75

COUNT TEN VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ...........................................................................78

COUNT ELEVEN VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW.............................................81

COUNT TWELVE VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT ......................................................................................84

COUNT THIRTEEN VIOLATION CALIFORNIA UNFAIR COMPETITION LAW……………………………………………………………………………88

COUNT FOURTEEN VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT……………………………………………92

VII.   PRAYER FOR RELIEF ..............................................................................95

IX.    JURY DEMAND .........................................................................................96

Plaintiffs Monte Swenson, Wilbur Pace, Noah Pace, Christopher Pace, Louise Large-Gurin, Elizabeth Kantor, Royal Alvis, Jr., Ann Engles, Kimberly Rosario, Jess Harris II and Susan Reed as trustees for The Harris Family Irrevocable Life Insurance Trust, Natalie C. Mackie as trustee for Trust UTD 12/28/1993, Michail Kerhoulas, Louisa Kerhoulas, and Laura Wheeler bring this action against Voya Retirement Insurance & Annuity Company, Voya Financial, Inc., Lincoln Life & Annuity Company of New York, Lincoln National Life Insurance Company, and Lincoln National Corp., and allege based upon the investigation of counsel and upon information and belief as follows:

## I. INTRODUCTION

1.     Defendants Lincoln National Life Insurance Company ("Lincoln National Life") and Lincoln Life & Annuity Company of New York ("Lincoln NY") and Voya Retirement Insurance & Annuity Company ("Voya") are for-profit life insurers.  Each insurance company operates within a holding company system consisting of other for profit insurance companies with a common parent entity (Defendant Lincoln National Corp. for Lincoln National Life and Lincoln NY, and Defendant Voya Financial Inc. for Voya).

2.     Because Defendants are for-profit insurers and hold large amounts of assets, they are under great pressure to pay dividends to their shareholders.

3.     Indeed, Voya's ultimate parent company, Voya Financial, is a holding company whose principal asset is the stock of its insurance company subsidiaries.  Voya Financial relies on dividends, returns of capital, and interest income on intercompany indebtedness from its insurance company subsidiaries, including Voya, to meet its obligations to pay dividends to shareholders, repurchase its securities and pay corporate expenses, and to pay interest and principal on outstanding debt obligations.

4.      Likewise, Lincoln National Corp. is a holding company that depends primarily on the ability of its subsidiaries, including Lincoln National and Lincoln NY, to pay dividends or to advance or repay funds to Lincoln National Corp. to meet its obligations to pay dividends to shareholders, repurchase its securities and pay corporate expenses, and to pay interest and principal on outstanding debt obligations.

5.      Prior to the financial crisis in 2008, both the Voya Defendants and Lincoln Defendants aggressively sold insurance and annuity products, including products guaranteeing minimum returns to their policyholders.  These products provided a significant cash inflow to the insurance subsidiary companies, who then paid large dividends to their parent companies.  In fact, between 2006 and through 2008, Lincoln National Life paid over $1.8 billion in dividends while Voya paid over $376 million in dividends to its parent.

6.      These products also generated significant long-term liabilities, particularly on these guaranteed obligations, and in order to meet these obligations and make a profit, Defendants needed investments yielding a higher rate of return than what they guaranteed to pay to policyholders who bought these products.

7.      To generate those returns, the Lincoln and Voya Defendants began to bet heavily on mortgage-backed securities, investing as much as 20% or more of their assets into what turned out to be an illiquid and overvalued investments.   In March 2007, ING (Voya) required Lincoln to enter into a trust arrangement whereby Voya would serve as beneficiary over a variety of assets, including mortgage-backed securities and government bonds.

8.      Because of the Great Recession and investments in mortgage-backed securities, both the Lincoln and Voya Defendants' became severely financially distressed and had to be bailed out because of their distressed financial condition.

9.      After the financial crisis in 2008, rather than forgo or substantially restrict their ability to pay dividends to shareholders, both the Lincoln Defendants and Voya Defendants engaged in a scheme to conceal from the public their true financial condition so they could continue doing business as usual and paying extraordinary dividends to their shareholders.

10.     Both the Lincoln and Voya Defendants concealed their true financial condition by moving billions of dollars of liabilities for policyholder claims off their balance sheets by using wholly-owned captive reinsurance transactions that have been called "financial alchemy" by New York's former Superintendent of Financial Services, Benjamin M. Lawsky, because in reality, the liabilities remain with the insurer, since the captives are incapable of independently satisfying the assumed obligations.  In fact, unlike traditional reinsurance with third-party reinsurers, the finances of these captives are hidden from consumers, the public, and even most regulators, and both the Lincoln and Voya Defendants used this lack of transparency to unload billions of dollars of insurance liabilities off their balance sheets.

11.     As a result of this captive reinsurance scheme, Lincoln National Corp. caused Lincoln National Life and Lincoln NY to pay more than $7.6 billion in "extraordinary stockholder dividends," and Voya Financial caused Voya alone to pay over $1.7 billion in stockholder dividends.

12.     Insurers are required to disclose all departures from Statutory Accounting Principles issued by the National Association of Insurance Commissioners (referred to as "NAIC SAP"), and adopted by every state, and the impact these departures have on either surplus or risk-based capital ("RBC").

13.     Even though the use of captive reinsurance departs as to NAIC SAP, neither the Lincoln insurance subsidiaries nor the Voya insurance subsidiaries reported the effect of these departures from NAIC SAP in their Annual Statements, thereby presenting a materially inaccurate

and misleading picture of their finances and ability to both meet their obligations to policyholders and continue to pay the extraordinary dividends to their parent companies.

14.     The Lincoln insurance subsidiaries and the Voya insurance subsidiaries, however, remain responsible for meeting these insurance obligations allegedly transferred to their captive reinsurers as they come due and needed to generate cash to meet the billions of dollars of insurance liabilities associated with policies they had issued, including the universal life policies issued by Voya and reinsured and administered by Lincoln National and Lincoln NY.

15.     Thus, the finances of both the Voya Defendants and Lincoln Defendants are linked because of: (1) the inability of Voya to meet its significant insurance obligations, including $1.8 billion in obligations for policies reinsured by Lincoln; and likewise, (2) the inability of Lincoln National or Lincoln NY to meet their significant insurance obligations, including $1.8 billion in reinsurance obligations for policies issued by Voya.

16.     Neither the Lincoln nor Voya Defendants had the assets necessary to cover their liabilities, including the Voya policies (with guaranteed minimum rates of return) reinsured and administered by Lincoln, particularly because between 2008 and 2016 Defendant Lincoln National paid $5.51 billion in dividends to shareholders and Voya paid $1.35 billion to its shareholders.

17.     To keep the scheme going, the Lincoln and Voya Defendants conspired with each other to generate more cash, or even cause policyholders to lapse or surrender their policies so Defendants could erase the liabilities.  Defendants did so by charging policyholders like Plaintiffs exorbitant premiums that Defendants falsely told policyholders were based on Cost of Insurance ("COI") increases.

18.     Thus, on June 1, 2016, Lincoln NY suddenly increased the COI charged to large blocks of former Aetna (now Voya) universal life insurance policyholders; in some cases, by as

much as 55%.[1]  According to the COI increase letter sent to Plaintiffs, Lincoln, who "act[s] as administrative agent for Voya," had decided to increase the COI on their policies.[2]

19.     Indeed, in 2016, through mailers, agent communications, and a myriad of other mediums, Lincoln NY began representing to Voya policyholders like Plaintiffs that their monthly payments would be dramatically increasing because the COI had increased as a result of "lower investment income and elevated costs."  This statement was false. According to their financial statements, the investment performance and cost associated with administering the life insurance business at Lincoln, Lincoln NY, and Voya has remained stable. In fact, for more than a decade, Defendants have represented to insurance examiners, policyholders, rating agencies, and shareholders the exact opposite of what they told Plaintiffs to justify paying extraordinary dividends and encourage investment by both policyholders and shareholders.

20.     The dramatic increases in monthly payments that Defendants levied on Plaintiffs are not due to legitimate COI increases but are the direct consequence of the Lincoln Defendants' and Voya Defendants' scheme to continue taking cash out of their insurance company subsidiaries while masking their troubled financial condition from the public.

21.     The improper increases are not permitted under the terms of Plaintiffs' policies. These charges do not result because of an increase in the COI but rather are a result of a conspiracy on the part of Defendants to address past practices of funneling billions of dollars out of their insurance subsidiaries (despite the subsidiaries' financial distress) by raiding policyholder accounts and improperly charging insureds who have dutifully paid premiums to Defendants for years, often decades.

---

[1] *See* Summary of Changes, Cost of Insurance Rates Effective June 1, 2016, LINCOLN FINANCIAL GROUP, p. 1, attached hereto as Exhibit 1.
[2] *See, e.g.*, May 31, 2016 Letter from Lincoln NY to Plaintiff W. Pace Re: Important Notification, attached hereto as Exhibit 2.

22.     Plaintiffs seek a return of these improper charges and legal remedies available under RICO, the common law, and other statutory provisions.

## II. PARTIES

### A.     Defendants and Their Affiliation

23.     Lincoln National Corporation ("Lincoln National Corp.") is a holding company, which operates multiple insurance and investment management businesses through subsidiary companies.  Lincoln National Corp. is incorporated under the laws of Indiana with its principal place of business at 150 North Radnor-Chester Road, Radnor, Pennsylvania 19087.

24.     Lincoln National Life Insurance Company ("Lincoln National Life") is an insurance company incorporated under the laws of Indiana and with its principal place of business at 1300 South Clinton Street, Fort Wayne, Indiana 46802.  All outstanding shares of Lincoln National Life are owned by Lincoln National Corp.

25.     Lincoln Life & Annuity Company of New York ("Lincoln NY") is a New York life insurance company, incorporated under the laws of New York and with its principal place of business at 120 Madison Street, Suite 1700, Syracuse, New York 13202.  All outstanding shares of Lincoln NY are owned by Lincoln National Life.

26.     All outstanding shares of Lincoln National Life and Lincoln NY are owned by Lincoln National Life and Lincoln NY's common parent company, Lincoln National Corporation ("Lincoln National Corp.").[3]  (Lincoln National Life, Lincoln NY, and Lincoln National Corp. will be collectively referred to as "Lincoln").

27.     Voya Financial, Inc. ("Voya Financial") is a holding company incorporated under the laws of Delaware and with its principal place of business at 230 Park Avenue, New York, NY

---

[3] *See, e.g.*, <u>Annual Statement for Year 2015 of the Lincoln National Life Insurance Company</u> at 19.11.

10169. Voya Financial was until known as ING U.S., Inc. until 2014 when it changed its name to Voya Financial, Inc.

28.     Voya Retirement Insurance & Annuity Company ("Voya") is a for-profit life insurance company incorporated under the laws of Connecticut that, upon information and belief has its principal place of business is One Orange Way, Windsor, Connecticut, 06095.   All outstanding shares of Voya are owned by Voya Financial.  (Voya and Voya Financial will be collectively referred to as "the Voya Defendants".)

**B.      The Plaintiff Policyholders**

29.     Plaintiff Monte Swenson is an adult resident of Colbert, Washington.  Plaintiff Swenson purchased an Aetna universal life insurance policy in 1988.

30.     Plaintiff Wilbur Pace ("W. Pace") is an adult resident of Eufaula, Alabama. Plaintiff W. Pace purchased an Aetna universal life insurance policy when he resided in Florida on December 15, 1986.

31.     Plaintiff Noah Pace ("N. Pace") is an adult resident of Ayden, North Carolina. Plaintiff N. Pace purchased an Aetna universal life insurance policy in 1987.  Plaintiff Christopher Pace ("C. Pace"), also an adult resident of Ayden, North Carolina, is listed as the owner and payor of the policy.

32.     Plaintiff Louise Large-Gurin is an adult resident of Raymore, Missouri.  Plaintiff Large-Gurin purchased an Aetna universal life insurance policy in 1989.

33.     Plaintiff Elizabeth Kantor is an adult resident of Shelton, Connecticut.  Plaintiff Kantor purchased an Aetna universal life insurance policy in 1992.

34.     Plaintiffs Royal Alvis Ann Engles, and Kimberly Rosario are adult residents of Chapel Hill, North Carolina, Hawley, Pennsylvania, and New York, New York, respectfully. They

are the policyholders of an Aetna universal life policy issued to their parents ("Alvis policy") in New York in 1993.

35.     Plaintiffs Jess Harris II and Susan Reed are adult residents of Oklahoma City, Oklahoma, and serve as trustees for The Harris Family Irrevocable Life Insurance Trust ("Harris Trust"), the policyholder of an Aetna universal life policy issued in California in 1995.

36.     Plaintiff Natalie C. Mackie is an adult resident of California, and serves as trustee for Trust UTD 12/28/1993, the policyholder of an Aetna universal life policy issued in California in 1998.

37.     Plaintiffs Michail Kerhoulas and Louisa Kerhoulas are adult residents of New Buffalo, Michigan, and each purchased and are policyholders of Aetna universal life policies issued in 1984 and 1986, respectfully.

38.     Plaintiff Laura Wheeler is an adult resident of Texas and purchased an Aetna universal life policies issued in 1992.

39.     Beginning October 1, 1998, Lincoln NY began administering the Plaintiffs' policies on behalf of Aetna, which was subsequently acquired by Voya Financial.

### III.  JURISDICTION AND VENUE

40.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) and jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1332(d) and § 1367.

41.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(a), (b) and (d).  The Defendants reside in, are found in, or have agents in and transacts affairs in the State of New York.

42.     Additionally, all Defendants purposefully avail themselves of doing business in New York and within this district, including but not limited to, by soliciting business in New York,

by advertising or promoting their services (including flexible premium adjustable life insurance and universal life insurance policies) to residents of New York, and by providing services in New York to New York residents.

43.     Venue is proper in this District pursuant to 18 U.S.C. §§ 1965(a) and (b), as Defendants reside in, are found in, have agents in, and transact affairs in New York.  Venue in this District is alternatively appropriate under 28 U.S.C. § 1391, because Defendant corporations are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim—such as communications and payments to the Defendants—occurred in this District.

## IV.  FACTS

A.     **General Background Allegations**

      1.     <u>**Voya's Relationship with Lincoln**</u>

44.     Plaintiffs' policies subject to this lawsuit originated with Aetna Life Insurance Company ("Aetna").  Aetna was a multiple-line insurer whose products including life insurance and annuities.

45.     In 1998, Aetna "sold" its domestic individual life insurance business to Lincoln National Corp. for $1 billion in cash. The transaction was generally in the form of an indemnity reinsurance arrangement, under which Lincoln National Life and Lincoln NY assumed from Aetna certain policyholder liabilities and obligations, although Aetna remained directly liable to policyholders. Also, certain Aetna employees became Lincoln National Corp. employees, and Lincoln had access to Aetna's sales distribution channels, as a result of the transaction.

46.     Plaintiffs' policies were part of the block of insurance that Lincoln reinsured as part of this sale.  In addition to serving as a reinsurer for Plaintiffs' policies, Aetna and Lincoln entered into an administrative services agreement in 1998, through which Aetna paid Lincoln to provide

certain administrative services on behalf of Aetna.[4]  Thereafter, Lincoln became the administrative agent of Aetna's policies and became the sole line of communication regarding Plaintiffs' policies.

47.    Thus, from 1998 onward, Lincoln collected all premiums and paid all claims as well as the expense of administering the policies, and all correspondence, annual statements, and policyholder inquiries were handled by Lincoln, on behalf of Aetna.

48.    Despite being the reinsurer, the coinsurance agreement between Lincoln and Aetna allowed Lincoln to further reinsure the liabilities and use its own captive reinsurance companies.[5]

49.    In 2000, ING acquired Aetna Financial Services for $7.7 billion.[6]  When ING acquired Aetna in 2000, it also acquired the result of the 1998 sale of Aetna's life business to Lincoln, namely the reinsurance transactions into which Lincoln had entered with Aetna, and related transactions and agreements.

50.    In 2013, after ING Group decided to sells its shares of ING U.S. through an initial public offering so that ING U.S. could "becom[e] an independent, standalone, U.S.-based company," ING U.S. was renamed "Voya Financial."[7]

51.    Although policyholders purchased an Aetna (now Voya) policy, Lincoln and Voya have blurred the distinction between their independent companies.  Policyholders pay their premiums to Lincoln, all communication regarding the policy comes from Lincoln, and to inquire about their policy, policyholders must call Lincoln's customer service or access their policy

---

[4] *See* Coinsurance Agreement between Aetna Life Insurance and Annuity Company and The Lincoln National Life Insurance Company (Oct. 13, 1998), Voya Financial, Inc. Form S-1/A p. 1541 (Jan. 23, 2013), http://d1lge852tjjqow.cloudfront.net/CIK-0001535929/c51a388f-03bf-4c44-a508-4acda8f90a5b.pdf.
[5] *Id.* at 1559.
[6] *Id.*
[7] *ING U.S. to rebrand as Voya Financial*, ING, https://www.ing.com/Newsroom/All-news/Features/Feature/ING-U.S.-to-rebrand-as-Voya-Financial.htm (last visited Jan. 31, 2017).

through Lincoln's website.  Moreover, in correspondence to policyholders, Lincoln has even referred to the Voya policyholders as "valued customer[s] of Lincoln Financial"[8] and "valuable Lincoln Life policy owner[s]."[9]

52.     Upon information and belief, Voya compensates Lincoln for its administration of the Plaintiffs' policies.  Likewise, Voya compensates Lincoln for reinsuring the same policies.

53.     In its 2015 Annual Report, Voya Financial states that Lincoln National Life established a trust to secure its obligations under the reinsurance transaction.  Moreover, "[o]f the reinsurance recoverable on the Consolidated Balance Sheets, $1.8 billion and $1.9 billion as of December 31, 2015 and 2014, respectively, is related to the reinsurance recoverable from the subsidiary of Lincoln under this reinsurance agreement."[10]  This trust agreement began in March 2007[11] and requires Lincoln to place "102% of the amount needed to fund all of the Reinsured Liabilities" into the trust with ING named as beneficiary.[12]

54.     This trust has portfolio investment goals that rely extremely heavily on government bonds and mortgage-backed securities.[13]  Within less than a year of the trust's creation, the Great Recession would expose mortgage-backed securities as "troubled" or toxic assets, sending stock prices plummeting.  Meanwhile, interest rates impacting the government bonds and other investments held in the Lincoln-Voya trust would be slashed dramatically over the next decade and continuing at record low levels up to the filing of this action.

---

[8] *See* December 24, 2014 Letter from Lincoln NY to Monte Swenson, attached hereto as Exhibit 3.
[9] *See* January 22, 2015 Letter from Lincoln NY to Monte Swenson, attached hereto as Exhibit 4.
[10] Voya Financial, Inc., Annual Report, p. 144 (2015),
http://s1.q4cdn.com/733568831/files/doc_financials/2015/annual/138420_006_web_clean.pdf.
[11] Grantor Trust Agreement between Lincoln NY and ING (Mar. 19, 2007), Voya Financial, Inc. Form S-1/A, p. 1654 (Jan. 23, 2013), http://d1lge852tjjqow.cloudfront.net/CIK-0001535929/c51a388f-03bf-4c44-a508-4acda8f90a5b.pdf.
[12] *Id.* at 1670.
[13] *Id.* at 1678.

2.      **Voya's Troubled History**

55.      Since at least 2008 and likely long before that date, the Voya U.S. insurance subsidiaries performed poorly due to both continuing issues with meeting guarantees they made to policyholders as well as above-average investment losses, largely from illiquid mortgage-backed securities.

56.      Moody's Investors Service repeatedly downgraded the credit rating of Voya and Voya's U.S. insurance business.[14]  As reflected in these Moody's rating actions, one reason for these financial problems is that Voya had, both prior to and after 2007, aggressively marketed insurance products having high guaranteed interest rates and/or no-lapse guarantees.

57.      Simultaneously, the Voya Defendants, as well as Voya Financial's other subsidiaries, invested heavily in risky mortgage-backed securities (both collateralized mortgage obligations ("CMO") and real estate mortgage investment conduits ("REMIC")) having no agency backing or guarantees.

---

[14] *See, e.g.*, Global Credit Research, *Rating Action: Moody's downgrades ING's ratings*, MOODY'S INVESTORS SERVICE (Oct. 21, 2008), https://www.moodys.com/research/Moodys-downgrades-INGs-ratings--PR_165323 ("The deterioration in ING US's credit profile has been driven by higher realized and unrealized investment losses in its sizable portfolio of subprime and Alt-A residential mortgage-backed securities and commercial mortgage-backed securities, which continue to remain largely illiquid and whose market valuations are depressed."); Global Credit Research, *Announcement: Moody's affirms ING insurance ratings; outlook changed to negative*, MOODY'S INVESTORS SERVICES (Dec. 13, 2010), https://www.moodys.com/research/Moodys-affirms-ING-insurance-ratings-outlook-changed-to-negative--PR_211157 ("[A] negative outlook is now appropriate because - although core earnings have shown recent signs of improvement -- ING US's net income remains weak, due to both continuing legacy variable annuity issues, as well as above-average investment losses, largely from structured securities."); Global Credit Research, *Rating Action: Moody's downgrades credit ratings of ING's US insurance subsidiaries (IFS to A3)*, MOODY'S INVESTORS SERVICE (Dec. 7, 2011), https://www.moodys.com/research/Moodys-downgrades-credit-ratings-of-INGs-US-insurance-subsidiaries-IFS--PR_232808, ("Commenting on the downgrade, Moody's said that the reserve charge is sizable relative to ING US's earnings and capital and weakens the US operation's stand-alone credit quality.").

58.    Indeed, the Annual Statements for these subsidiaries show how the Voya Defendants, as well as Voya Financial's other subsidiaries, investment in "other" CMOs and REMICs (that is, those having no agency backing or guarantees) had by 2008 grown to represent between 17% or even over 20% of invested assets and over 200% and sometimes over 300% of reported surplus.  As of 2011, Security Life still had an investment of over $2.9 billion in these types of mortgage-backed securities, which represented over 18.9% of its invested assets and over 190% of reported surplus. The Annual Statements for these subsidiaries show how the Voya Defendants, as well as Voya Financial's other subsidiaries, further show that even as of 2011 these types of mortgage-backed securities still represented a significant percentage of both invested assets and surplus.

59.    For example, ING Life and Annuity's (now Voya) Annual Statements show that its investment in "other" CMOs and REMICs grew to over $3.58 billion by 2008, which represented over 18% of its invested assets and over 235% of reported surplus.  As of 2011, ING Life and Annuity still had an investment of over $1.3 billion in these types of mortgage-backed securities, which represented over 6.1% of its invested assets and over 72% of reported surplus.

60.    Upon information and belief, the Voya Defendants invested heavily in mortgage-backed securities betting that this growing portfolio of risky CMOs and REMICs would generate returns that would match or exceed the returns that they guaranteed to policyholders and enable them to continue to pay dividends.

61.    This risky investment strategy was a failure as the returns Voya Financial and its insurance subsidiaries anticipated earning from their investment strategy never materialized and, compounding the problem, the market prices for these mortgage-backed securities plummeted.

62.    Additionally, the prolonged period of low interest rates after 2007 that continues today means that Voya Financial and its insurance subsidiaries were, upon information and belief,

unable to make investments that generated returns equal to or higher than the returns they guaranteed to policyholders.

63.     Another reason for Voya's financial problems is that its shareholder/parent, Voya Financial, regularly caused them to distribute to Voya Financial tens of millions of dollars each year to in the form of dividends and capital distributions.

64.     Upon information and belief, Voya Financial directed its insurance subsidiaries to make these dividends or return of capital payments in order to further the accounting schemes discussed herein, and to help prop-up the finances of its then-ultimate parent, ING Group, whose financial condition had deteriorated to the point that it needed an approximately $13.5 billion bailout.[15]

65.     As part of that rescue package, the Dutch government also required ING Group to fully divest itself of its poorly performing U.S. insurance subsidiaries.  Unable to find a buyer, however, ING Group decided to sell its shares of ING U.S. through an initial public offering.

### 3.     Lincoln's Troubled Financial Status Leads To Acceptance of TARP Funds

66.     In June of 2009, Lincoln National Corp. accepted funds from the government's Troubled Asset Relief Program ("TARP").[16]  Lincoln received preliminary approval to receive up to $2.5 billion from the government, but accepted $950 million.[17]  At the same time, Lincoln announced it would raise another $600 million through a common stock offering and another $500

---

[15] *Transactions with Dutch State*, ING (March 31, 2014), https://web.archive.org/web/20140408000022/http://www.ing.com/Investor-relations/Transactions-with-Dutch-State.htm.
[16] "Lincoln Financial accepts TARP money," HARTFORD BUSINESS (June 15, 2009), http://www.hartfordbusiness.com/article/20090615/NEWS01/306159937/lincoln-financial-accepts-tarp-money.
[17] *Id.*

million through a senior debt offering.[18]  About $1 billion of this new cash was contributed to Lincoln National Life Insurance Co., while the remaining funds were held at the holding company for "general corporate purposes, including the repayment of short-term debt."[19]

67.    "Lincoln used TARP to finance 'expansion' of its annuities and life insurance sales,"[20] and, according to Lincoln officials, it could use each TARP dollar to finance "roughly 20 times that amount" in new insurance and annuity sales.[21]

### 4.    The Captive Reinsurance Scheme

68.    Although financially troubled and needing assets, both Voya and Lincoln paid massive dividends to their shareholders.

69.    Both Voya and Lincoln did so by using wholly-owned captive reinsurance transactions to move billions of dollars of liabilities for policyholder claims off their balance sheets, although these captive companies are incapable of satisfying their assumed obligations.

### a.    *Accurate reporting of surplus and RBC under NAIC SAP is required.*

70.    The insurance company Defendants, like every other insurance company in the United States, are required each year to prepare and file a sworn Annual Statement based on the convention blank form adopted by the NAIC.  The Annual Statement is a detailed statement of an insurance company's finances that must be prepared in accordance with the NAIC Annual Statement Instructions and NAIC Accounting Practices and Procedures Manual.

71.    The NAIC Accounting Practices and Procedures ("AP&P") Manual provides the Rules of Statutory Accounting for Insurance Companies, referred to as SAP.  Every state requires

---

[18] *Id.*
[19] *Id.*
[20] Joseph N. DiStefano, *Lincoln National to pay back $1 billion US bailout*, PHILLY.COM (June 14, 2010 9:01 AM EDT), http://www.philly.com/philly/blogs/inq-phillydeals/Lincoln_National_to_pay_back_1_billion_US_bailout.html (quoting Special Inspector General Neil Barofsky).
[21] *Id.*

the adoption of the AP&P Manual and the Annual Statement Instructions.  Statutory accounting rests on principles unique to insurance company accounting of conservatism, consistency and recognition.  *See* SAP Preamble.

72.     Connecticut (Defendant Voya's state of domicile) and New York (Defendant Lincoln NY's state of domicile) and all other states, require all Annual Statements conform to the annual statement instructions and manuals promulgated by NAIC.  An Annual Statement is a detailed statement of an insurance company's finances prepared according to SAP, to the extent they are not in conflict with applicable state statutes or regulations, and management of every U.S.-based life insurer swears, under penalty of perjury, that the financial condition as reported in the Annual Statement is a full and true statement of the financial condition of their company.

73.     While states can either (1) prescribe certain accounting practices in their state laws, regulations, or general rules that may differ from NAIC SAP, or (2) permit account practices that differ from NAIC SAP, ***both the deviation and its financial effect must be disclosed specifically in an insurance company's Annual Statement***.  SAP No. 1.  Thus, if an insurer's use of a state accounting practice that departs from NAIC SAP affects surplus or RBC, it must disclose both the accounting practice and explain the financial impact to the insurance company in Note 1 of the Annual Statement. *See* SAP No. 1.

        **b.**     ***Two main ways insurance companies are measured for ability to meet long term obligations:  surplus and risk-based capital***

74.     There are two main metrics by which consumers and the public determine whether an insurance company is adequately capitalized to meet future policy holding obligations:  surplus and risk-based capital ("RBC") ratio.

        **(i)     Surplus as a measure of solvency.**

75.     Surplus is derived by comparing the company's admitted assets to all of its liabilities, including its current and projected future obligations to policyholders and annuity

holders.  Admitted assets are assets of the insurer available for the satisfaction of its obligations to its policyholders.  AP&P Manual, at SAP No. 4.  A contingent letter of credit ("LOC") is an example of an asset that ***cannot*** be an admitted asset.

76.    In addition, even though an insurer may be part of a holding company system, the surplus (and solvency) of each insurance company is determined solely by that company's finances independent of the finances of any other affiliated company within the holding company system.

77.    If a life insurance company's statutory surplus falls below the minimum legal levels, or if the company operates at an annual loss, it is not permitted to pay dividends to shareholders and may not be able to continue operations.

### (ii)    RBC as a measure of ability to meet future obligations.

78.    RBC is another measure of insurance company solvency, and is one of the most important factors examined in determining an insurance company's ability to meet future obligations.

79.    RBC limits the amount of risk a company can take by requiring a company with a higher amount of risk to hold a higher amount of capital.  Stated another way, RBC is a ratio that measures a company's ability to meet its future obligations and, all things being equal, a company with a higher RBC ratio is more capable of meeting its future obligations than a company with a lower RBC ratio.

80.    RBC is intended to be a ***minimum*** capital standard and not necessarily the full amount of capital that an insurer would want to hold to meet its safety and competitive objectives.

81.    If a company's financial reporting is accurate, reported RBC alerts the public and regulators to potentially undercapitalized companies.

### c. *Transactions with affiliates can manipulate surplus and RBC*

82.     "An 'affiliate' . . . is a [company] that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the [company] specified."  Insurance Holding Company System Regulatory Act §1A.

83.     In arm's-length transactions between unaffiliated entities, both companies are independently incentivized to ensure that liabilities transferred mirror liabilities assumed, and that the transferred assets are real and sufficient to cover the assumed liabilities.  For the ceding company to take a reserve credit, the reinsurance agreements must transfer risk from the ceding entity to the reinsurer.  SAP 61R, ¶ 17.

84.     When insurance companies engage in reinsurance, coinsurance, and modified coinsurance transactions with affiliated entities, the companies can manipulate their balance sheets or risk profiles.  Such transactions can foist large liabilities or risky assets onto an affiliated entity that is not subject to the strict capital and surplus requirements imposed on life insurance companies for the policyholders' benefit and have no valid economic purpose.

### d. *The Use of Wholly-Owned Captives*

85.      Becoming effective in January 2000, the NAIC's Regulation XXX reserving methodology was a response to life insurer's attempt to drive down reserves by creating products that had excessively late-duration guaranteed premiums.  Regulation XXX was intended to foreclose this practice, which was generally regarded as a loophole exploitation, and significantly increased the U.S. statutory reserve requirements for term life insurance writers.

86.     Universal life ("UL") policies with secondary guarantees are subject to Regulation AXXX (also known as Actuarial Guideline 38), which also significantly increased the U.S. statutory reserve requirements for these life insurance products.  The reinsurance market for policies subject to AXXX reserve requirements is very limited and most insurers retain the risk.

87.     To address the looming capital needs associated with XXX and AXXX reserves, many for-profit life insurance companies turned to so called "alternate capital-funding solutions," including securitization.

88.     Special Purpose Vehicles ("SPVs") are often used in securitization.  An SPV is set up to serve a specific purpose, such as raising capital and servicing investors in a securitization, and performs little or no other activities.

89.     In the last decade, several states, including Arizona, Vermont, and South Carolina, encouraged the formation of the "special purpose financial captives" ("SPFCs")—a specific type of SVP—in their states, hoping to generate fee revenues and create jobs.  Such state programs feature confidentiality protections that shield the SPFCs' financial condition from the view of consumers (and even from other state regulators), effectively allowing insurance companies to create U.S. subsidiaries whose balance sheets are secret. *See e.g.* VT. STAT. ANN. tit. 8, § 6002(c)(3)(A) and (B).

90.     As captives have become more prevalent the NAIC has expressly stated that these entities should not be used to manipulate company finances: "Commercial insurer-owned captives and [SPFCs] ***should not be used to avoid statutory accounting***."[22]

91.     The NAIC White Paper also stated that conditional LOCs, which cannot be admitted assets pursuant to SAP, were not appropriate means for capitalizing captive SPFCs:

---

[22] *Captives and Special Purpose Vehicles: An NAIC White Paper*, NAIC (July 2013) (hereinafter "NAIC White Paper"), at 3 (emphasis added); *see also id.* at 20 ("the general opinion of the Subgroup was that it is inappropriate for captives and [SPFCs] to be used as a means to avoid statutory accounting"); 23 (recognizing "a consensus view that captives and special purpose vehicles should not be used by commercial insurers to avoid statutory accounting prescribed by states"); 30 ("The practice of using a different entity or different structure outside of the commercial insurer to engage in a particular activity because of a perception that the regulatory framework does not accurately account for such activity should be discouraged. The Subgroup held a consensus view that captives and [SPFCs] should not be used by commercial insurers to avoid statutory accounting prescribed by the states.").

>The transactions involving conditional LOCs or parental guarantees effectively permit assets to support reinsurance recoverables, either as collateral or as capital, in forms that are otherwise inconsistent with requirements under Model #785 and Model #786 or other financial solvency requirements applicable to U.S.-domiciled commercial assuming insurers. The Subgroup held a consensus view that these types of transactions may not be consistent with the NAIC credit for reinsurance requirements.

NAIC White Paper, at 23.

92.     The New York Department of Financial Services also warned about the use of captive reinsurers by the life insurance industry, stating "[s]hadow insurance could potentially put the stability of the broader financial system at greater risk."[23]

93.     Otherwise regulated commercial insurers, such as Defendants, cannot do through an SPFC what it is prohibited from doing by SAP.  Liabilities originating with, and retained by, the ceding insurer cannot be granted favorable treatment merely by reporting that those liabilities are on the books of an affiliated captive.  *See, e.g.*, NAIC White Paper, at 28 ("allowing a captive or [SPFC] to account for LOCs or parental guarantees as assets [is] something not permitted in the current statutory accounting framework.").  Likewise, risky assets that would normally affect a company's RBC ratio cannot simply be transferred to a wholly owned captive entity to make the insurance company look financially stable when it is not.

94.     Lincoln National Corp., Lincoln National Life, Lincoln NY, Voya Financial, and Voya have used SPFCs and other affiliated entities to facilitate a fraudulent scheme to not reporting these departures from statutory accounting rules and principles to make Defendants appear financially stable, inflate statutory surplus, and magically improve their RBC ratios.  As shown below, Defendants, used the confidentiality afforded by Vermont, South Carolina, Missouri,

---

[23]  Benjamin M. Lawsky, *Shining a Light on Shadow Insurance*, p. 1 (June 2013), http://www.dfs.ny.gov/reportpub/shadow_insurance_report_2013.pdf.

Arizona, Barbados, and Bermuda to evade SAP principles, to misstate its true surplus, and mask its troubled financial condition to regulators, rating agencies, and ultimately, its life insurance customers.  This provides the impetus for the cost of insurance increase experienced by Plaintiffs.

**B.    Defendants' Captive Insurance Scheme**

95.    Lincoln and Voya both utilize a number of wholly-owned captive reinsurance companies to further their reinsurance scheme that resulted in the large COI increases imposed on Plaintiffs.

**1.    <u>Voya's Captive Reinsurance Scheme</u>**

96.    Following the NAIC's adoption of Regulation XXX and AXXX, Defendants were required to increase their policy reserve liabilities to levels much higher than in previous years.

97.    Voya began, as early as 2000, engaging in a series of "captive reinsurance" schemes to sidestep these higher reserve requirements and set aside far less reserve liabilities to cover future claims.

98.    By 2015, Voya's captive reinsurance portfolio had expanded to include domestic captives in Arizona and Missouri.  When Voya "ceded" liabilities to its own captives, they took "reserve credits" in 2015 of $1.06 billion.[24]  In simplified terms, Voya *reduced* its reported policy liabilities by $1.06 billion, thereby reducing the amount of assets it needed to hold to match the policy liabilities.

99.    To be allowed to recognize that $1.06 billion reserve credit, traditional standards of statutory accounting require Voya to send to its affiliated reinsurers assets commensurate with the policy liabilities ceded.  However, Voya chose to form captives in Arizona, Missouri, and

---

[24] In comparison, Moody's Investors Service recognized that on August 23, 2013, Voya (then known as ING) had taken $15 billion in reserve credit. *The Captive Triangle: Where Life Insurers' Reserve and Capital Requirements Disappear*, MOODY'S INVESTORS SERVICE, Appendix III (Aug. 23, 2013).

Bermuda to take advantage of what Voya would describe as regulatory arbitrage.  Under these jurisdictions, the insurance regulators allow certain types of captives to depart from reserving requirements applicable to life insurers.  Specifically, these captives have extremely low capital requirements and are permitted to carry certain "investments" as admitted assets that do not qualify under the standard accounting definition of assets.

100.    Thus, under the laws of Arizona and Missouri, contingent letters of credit, parental guarantees and other types of contingent investments, while not admitted assets under NAIC SAP, may be approved by the regulators as admitted assets for *captive reinsurers domiciled in their states*.

101.    NAIC SAP would not permit a regular life insurer in the United States to report such contingent investments as admitted assets.  In fact, NAIC's SAP 97 specifically prohibits a parent company—such as Voya—from receiving on its books any benefit recognized from such a transaction within its subsidiary.

102.    Specifically, for collateral, Voya captives use a combination of funds withheld and held in a segregated account at Voya, assets held in a reserve credit trust, and LOCs.  In 2013, the "assets" of Voya (then known as ING) captives were comprised of $7.1 billion in funds withheld, $4.6 billion in trust agreements, and $4.4 billion in LOCs.[25]

103.    Despite taking reserve credit for ceding policy liabilities to its captives and substantially underfunding its reserves as a result, Voya failed to properly disclose such substantial departures from NAIC SAP in Note 1 of its Financial Statements.

104.    Moody's Investor Service prepared a Special Comment report dated August 23, 2013, entitled *The Captive Triangle: Where Life Insurers' Reserve and Capital Requirements*

---

[25]MOODY'S, *supra* note 24, at Appendix III.

*Disappear*,[26] which included specific references to Voya Financial (then known as ING), by and through Voya (formerly ING Life Insurance Annuity Company).  In the opening paragraph of that report, Moody's states "a growing reliance on captives places incremental negative pressure on the industry."  Appendix III of the Moody's document reports that the Voya companies had taken reserve credits on their life business of approximately $15 billion from their *unauthorized* general account affiliates. To see the mix of which captives were involved, the December 31, 2012 sworn annual statement of Voya Retirement Insurance and Annuity shows that these captives are domiciled across South Carolina, Missouri and the Cayman Islands.[27]

105.    The Department of Treasury Office of Financial Research ("OFR") would later report its concerns about the Voya companies and other for-profit life insurers' use of "off-balance sheet captives."[28]  The OFR found the following regarding the assets of two of Voya's captive reinsurers—Roaring River IV LLC and Security Life of Denver International:

| Ceding Insurer | Captive Reinsurer | Part 1: Statutory Reserve Credit Taken | Part 2: Reserve Credit Taken | Supporting Assets | Cash | NAIC 1 | NAIC 2 | NAIC 3 | NAIC 4+ | Evergreen LOC | Other LOC | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security Life of Denver Insurance Co. | Roaring River IV LLC | 1,083 | 1,083 | 1,057 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% |
| | Sec Life of Denver Intl Ltd. | 3,555 | 3,555 | 3,851 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 52.4% | 47.6% |
| Subtotal | | 4,638 | 4,638 | 4,908 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 41.1% | 58.9% |

Appendix Figure A-1.  Note that "Other LOC" heading means these LOCs are not "Evergreen," meaning they are not guaranteed to be renewed and do not comply with NAIC standards as the

---

[26] MOODY'S, *supra* note 24, at 1.

[27] SLDIL was domiciled in the Cayman Islands during the time of this report, but is now domiciled in Arizona—a state known for its lax laws regarding captive reinsurance companies.

[28] Jill Cetina, Arthur Fliegelman, Jonathan Glicoes & Ruth Leung, *Mind the Gaps: What Do New Disclosures Tell Us About Life Insurers' Use of Off-Balance-Sheet Captives?*, OFFICE OF FINANCIAL RESEARCH, Brief Series 16-02 (Mar. 17, 2016), https://www.financialresearch.gov/briefs/files/OFRbr_2016-02_Captive-Insurers.pdf.

LOC issuer might unilaterally exit their support.

106.    Because Voya has merely shoved its liabilities downward into its captives, the liabilities, in fact, go nowhere as no risk has been transferred.

107.    Despite taking hundreds-of-millions–of-dollars of reinsurance credit for numerous captive reinsurance transactions, and departing from NAIC SAP, Voya falsely reported that these transactions did ***not*** depart from NAIC SAP and in fact followed NAIC SAP in Note 1 of its sworn Annual Statements. This scheme had a simple and common purpose: to give Voya the false appearance of strong surplus and RBC and overall financial strength.

### 2.    Lincoln's Captive Reinsurance Scheme

108.    Lincoln National Life began, as early as 2003, engaging in the same captive reinsurance transactions.   The schemes began with a total of reserve credits for reinsurance transferred to captives at year-end 2004 in the amount of $372 Million.  The schemes increased to more than $10.7 billion in 2015:



109.    In 2003, Lincoln National Life was using "Offshore" captives: a Barbados captive reinsurer named Lincoln National Reinsurance Company (Barbados) Limited.  By 2015, Lincoln

National Life's captive reinsurance portfolio had expanded to include domestic captives in Vermont and South Carolina, two states allowing captives with zero transparency. When Lincoln National Life "ceded" these liabilities to its own captives, they took "reserve credits" in 2015 of $10.7 billion.[29] Lincoln National Life reduced its reported policy liabilities by $10.7 billion, thereby reducing the amount of assets it needed to hold to match the policy liabilities.

110.    To be allowed to recognize that $10.7 billion reserve credit, traditional standards of statutory accounting require Lincoln National Life to send to its affiliated reinsurers assets commensurate with the policy liabilities ceded. However, Lincoln National Life chose to form captives in Vermont, South Carolina, and Barbados to take advantage of what Lincoln National Life would describe as regulatory arbitrage.

111.    For collateral, Lincoln National Life captives use a combination of funds withheld and held in a segregated account at Lincoln National Life, assets held in a reserve credit trust, and LOCs.[30] In 2013, the "assets" of Lincoln National Life captives were comprised of $4.9 billion in funds withheld, $1.2 billion in trust agreements, and $2.6 billion in LOCs.[31] The LOCs used are typically irrevocable and of relatively long duration (12-20 years). These LOCs may contain limited conditions that specify that other sources of funds available to the captive must be used prior to a draw occurring on the LOC.[32]

112.    Lincoln NY and Lincoln National Life are dependent on Lincoln Reinsurance Company of Vermont ("LRCV") I; LRCV III; and LRCV IV for over $3.5 billion.

---

[29] In comparison, Moody's Investors Service recognized that on August 23, 2013, Lincoln National Life had taken $6.9 billion in reserve credit. MOODY'S, *supra* note 24, at Appendix III.

[30] M Financial Group, *The Use of Captives in the Life Insurance Industry*, BCG COMPANIES, p. 8 (July 2013), http://www.bcgco.com/NewsResources/Update/BCG_M%20White%20Paper_Captives_July%202013.pdf.

[31] MOODY'S, *supra* note 24, at Appendix III.

[32] M Financial Group, *supra* note 30, at 8.

113.    Despite taking reserve credit for ceding policy liabilities to its captives and substantially underfunding its reserves as a result, Lincoln National Life failed to properly disclose such substantial departures from NAIC SAP in Note 1 of its Financial Statements.

114.    The Moody's report described above also specifically referenced Lincoln National Corp. and Lincoln National Life.  The table included at Appendix III reports that Lincoln National Life had taken reserve credits on their life business of nearly $7 billion from their *unauthorized* general account affiliates.

115.    Additionally, the OFR found the following regarding the assets of Lincoln's captive reinsurers:

| Ceding Insurer | Captive Reinsurer | Part 1: Statutory Reserve Credit Taken | Asset Composition | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Part 2: Reserve Credit Taken | Supporting Assets | Cash | NAIC 1 | NAIC 2 | NAIC 3 | NAIC 4+ | Evergreen LOC | Other LOC | Other |
| Lincoln National Life Insurance Co. | Lincoln Re Co. of VT I | 1,379 | 1,379 | 1,379 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 65.5% | 34.5% |
| | Lincoln Re Co. of VT III | 1,893 | 1,893 | 1,893 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 44.1% | 55.9% |
| | Lincoln Re Co. of VT IV | 1,023 | 1,023 | 1,023 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 98.9% | 1.1% |
| | Lincoln Reinsurance Co. of SC | 441 | 441 | 543 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% |

Appendix Figure A-1.  Just as with Voya, the "Other LOC" heading meaning that these LOCs are not "Evergreen," or guaranteed to be renewed.

116.    Lincoln National Life ceding $10.7 billion of liabilities to itself or its sister companies, as compared to *unaffiliated* traditional reinsurance of $9 billion.

117.    Lincoln National Life falsely reported that these captive transactions did ***not*** depart from NAIC SAP and in fact followed NAIC SAP in Note 1 of its sworn Annual Statements.  This scheme had a simple and common purpose: to give Lincoln National Life the false appearance of strong surplus and RBC and overall financial strength.

**C.   Defendants Move Policyholders to the End of the Line, Putting Investors Ahead to Receive Excessive Stockholder Dividends**

118.   The use of the above-described reinsurance transactions, paired with the implementation of drastic COI increases, have allowed Defendants to divert significant assets to investors in the form of stockholder dividends.

**1.   Voya's Payment of Dividends to Voya Financial**

119.   To that point, Defendant Voya paid $1,725,045,742 in stock dividends to Voya Holdings and ultimately to Defendant Voya Financial from 2006 through September 30, 2016.  The illustration below demonstrates the handsome dividend increases paid by Voya to Voya Holdings, which eventually made it to Voya Financial:

### Voya Retirement Ins & Annuity Co
### Dividends Paid to Stockholders

| Year | Dividends Paid to Stockholders |
|------|-------------------------------|
| 2015 | ($321,000,000) |
| 2014 | ($371,000,000) |
| 2013 | ($264,000,000) |
| 2012 | ($190,045,742) |
| 2011 | $0 |
| 2010 | ($203,000,000) |
| 2009 | $0 |
| 2008 | $0 |
| 2007 | ($145,000,000) |
| 2006 | ($231,000,000) |
| | ($1,725,045,742) |

120.   Most of the stockholder dividends paid during that period would have been required by law to be classified as "extraordinary."  Extraordinary dividends can be issued only when Voya's financial health meets the legally required thresholds; a company should not issue dividends when it does not possess the requisite financial health to do so.   Accordingly,

Connecticut explicitly addresses the circumstances where stockholder dividends may be issued. *See* Conn. Gen. Stat. § 38a-136.

121.    Voya was only able to pay such dividends through the above-described reinsurance scheme.  By "ceding" the policy liabilities, Voya "freed" up cash, and used that cash to pay these dividends.

122.    While the Voya dividend scheme has greatly benefited Voya Financial's executives and shareholders, it has placed significant downward pressure on Voya's liquidity and benchmark ratios.  Now, at this late stage, Voya Financial continues to require Voya to pay ever-increasing dividends to Voya Financial; however, having already leveraged its life insurance blocks of business through these captive schemes, Voya has continued paying hefty dividends by taking the funds from policyholders through a fraudulent COI increase.

## 2.    Lincoln National Life's Payment of Dividends to Lincoln National Corp.

123.    In similar fashion, Lincoln National Life paid $7,620,876,224 in stock dividends to Lincoln National Corp. from 2006 through September 30, 2016.  The illustration below demonstrates the handsome dividend increases paid by Lincoln National Life to Lincoln National Corp.:

## Lincoln National Life Insurance Company

| Year | Stockholder Dividends Paid |
|------|----------------------------|
| Q3 2016 | ($850,000,000) |
| 2015 | ($1,121,000,000) |
| 2014 | ($705,000,000) |
| 2013 | ($640,000,000) |
| 2012 | ($605,000,000) |
| 2011 | ($800,000,000) |
| 2010 | ($684,000,000) |
| 2009 | ($405,000,000) |
| 2008 | ($400,000,000) |
| 2007 | ($1,060,876,224) |
| 2006 | ($350,000,000) |
| | ($7,620,876,224) |

124.    Most of the stockholder dividends paid during that period would also have been required by law to be classified as "extraordinary." As described, during the relevant period, Lincoln National Life did not possess the requisite financial health to justify paying extraordinary dividends. Lincoln National Life was only able to pay such dividends through the above-described sham reinsurance scheme. By "ceding" the policy liabilities, Lincoln National Life "freed" up cash, and used that cash to pay these dividends.

125.    Just like Voya, Lincoln National Life's annual financial statements falsely portrayed a stable company with ample capital and assets on hand to meet its long-term obligations and pay such monstrous dividends.

126.    While the Lincoln National Life dividend scheme has greatly benefited Lincoln National Corp.'s executives and shareholders, it has placed significant downward pressure on Lincoln National Life's liquidity and benchmark ratios. Now, at this late stage, Lincoln National Corp. continues to require Lincoln National Life to pay ever-increasing dividends to Lincoln National Corp.; however, having already leveraged its life insurance blocks of business through

29

these captive schemes, Lincoln National Life had allowed Lincoln National Corp. to continue paying hefty dividends by taking the funds from policyholders through a fraudulent COI increase.

### D.    Defendants' COI Increase

127.    Defendants market and sell life insurance policies through an expansive marketing machine, predominantly made up of agents and brokers.  On information and belief, the marketing specifics touted by agents and brokers lack the requisite information necessary for potential policyholders to understand how COI is calculated and the effect various factors may have on monthly debits to their policies' cash value.

128.    Information provided to policyholders fails to illuminate how Defendants determine premiums and how policyholders could potentially bear the cost of various expenses. Policyholders do not possess the basic information necessary to determine whether Defendants accurately calculate and attribute COI, and the ultimate cash value of the policy.

### 1.    <u>Lincoln and Voya's Special Relationship Regarding the Life Policies at Issue</u>

129.    Beginning in October 1998, Aetna (now Voya) began reinsuring Plaintiffs' blocks of policies with Lincoln.

130.    Ninety-nine percent (***99%***) of Voya's *unaffiliated* reinsurance transactions (i.e. not wholly-owned captive reinsurance transactions) are with Lincoln NY—equaling $1.78 billion of $1.8 billion.

131.    Voya and Lincoln entered into an administrative services agreement effective as of October 1, 1998, through which Lincoln was paid by Voya to provide certain administrative services on behalf of Voya.[33]

---

[33] *See* Coinsurance Agreement between Aetna Life Insurance and Annuity Company and The Lincoln National Life Insurance Company (Oct. 13, 1998), Voya Financial, Inc. Form S-1/A p. 1541 (Jan. 23, 2013), http://d1lge852tjjqow.cloudfront.net/CIK-0001535929/c51a388f-03bf-4c44-a508-4acda8f90a5b.pdf.

132.    All correspondence, annual statements, and policyholder inquiries have been handled by Lincoln, on behalf of Voya.  Importantly, although policyholders purchased an Aetna (now Voya) policy, Lincoln and Voya have blurred the distinction between their independent companies.

133.    Despite being the reinsurer, the coinsurance agreement between Lincoln and Voya allows Lincoln to also reinsure the liabilities, and does not limit it in doing so.  In fact, Lincoln *can even use its own captives*, and upon information and belief, does so, furthering the Defendants' need for cash.[34]

134.    In its 2015 Annual Report, Voya Financial states that Lincoln National Life established a trust to secure its obligations under the reinsurance transaction.  In fact, ING and Lincoln entered into this trust agreement in March 2007.[35]  This agreement requires Lincoln to place "102% of the amount needed to fund all of the Reinsured Liabilities" into the trust with ING named as beneficiary.[36]

135.    This trust has portfolio investment goals that rely extremely heavily on government bonds and mortgage-backed securities.[37]  Less than a year after Lincoln and Voya entered into the trust agreement, the Great Recession began, mortgage-backed securities plummeted in value, and government bonds and investments were hit with record low interest rates.

136.    Thus, the Lincoln/Voya trust's investments have not performed as expected, and the Defendants were not receiving the investment income they expected.

---

[34] *Id.* at 1559 ("3.9 Third-Party Reinsurance.  In the event the Reinsurer desires to retrocede to any third-party reinsurer (whether or not Affiliated with the Reinsurer) any portion of the Liabilities reinsured by it under this Agreement, the Reinsurer shall be responsible for obtaining such retrocessional coverage at its sole expense.").
[35] Voya Financial, Inc. Form S-1/A, *supra* note 4, at 1654.
[36] *Id.* at 1670.
[37] *Id.* at 1678.

137.    As the trust beneficiary, Voya receives annual reports on the trust's status. Therefore, Voya knew and has known for a decade that something needed to be done to increase the trust's assets as they back the Voya policies ceded to Lincoln.  Consequently, upon information and belief, Lincoln collaborated with Voya to increase the COI on the policies at issue here.

138.    Under the terms of the Coinsurance Agreement, Lincoln may make recommendations with respect to the COI on the policies, and Voya is to take "into account the recommendation of the Reinsurer with respect thereto."[38]   Thus, neither party unilaterally made the decision to increase the COI.

139.    Because of the precarious positions both companies are in due to: (1) dumping liabilities into captive reinsurance companies, (2) paying excessive dividends to enrich shareholders (at policyholders' expense), (3) failing to adjust investments over the past decade after low interest rates, and (4) bad investment returns since the Great Recession, Lincoln and Voya conspired to generate new assets through recouping past losses by massively increasing the COI on Plaintiffs.[39]

140.    Upon information and belief, Voya and Lincoln selected policies based on their age in order to purposely force many, if not most, policyholders into a lapse or surrendering their policies for the cash value, due to the increase in their COI rate.[40]

---

[38] *Id.* at 1556.
[39] *See* Ron Sussman, *Commentary: Cost of Insurance Increases Keep Coming*, INSURANCENEWS.NET (Oct. 14, 2016)
https://www.insurancenewsnet.com/innarticle/commentary-cost-insurance-increases-keep-coming.
[40] *Id.* ("A common theme among the carriers that have, so far, announced these COI increases is that the insureds most affected are 70 and over.  Most of them will be unable to replace their coverage due to age, medical conditions and the cost of suitable replacement policies. . . . The actual, and possibly intended, consequence of these COI increases will be a high percentage of lapsed policies, which will surely benefit the carrier.")

141.    Additionally, Voya and Lincoln targeted these policies as the policyholders had large amounts saved in the Account Value of their policies.  As the excessive COI increase took effect on Plaintiffs policies, their Account Values quickly decreased as Voya and Lincoln profited from a windfall.

142.    Plaintiffs have literally watched as Defendants plundered their savings in their Account Values, effectively making Plaintiffs' investments worthless.

143.    Voya compensated Lincoln as administrative agent and reinsurer for Plaintiffs' policies, and for notifying policyholders of the excessive cost of insurance spike, handling inquiries from policyholders, managing policyholders' Account Value and premium collection, and essentially serving as an institutional layer between policyholders and Voya.

### 2.      Overview of Life Policies at Issue

144.    The policies at issue are universal life and variable universal life insurance policies. Under the terms of the policy, any premium payments made in excess of the monthly deduction are credited to the policies cash value.  Policyholders are given the option to pay additional premiums, not to exceed $25,000 during each policy year.

145.    Under the convoluted terms of these particular policies, the cash value is determined on a monthly basis as follows: (a) minus (b) where:

> (a)      is the sum of
> (1)      the cash value on the last previous monthly deduction day with interest to date; and
> (2)      premiums paid since the last previous monthly deduction day with interest to date;
> and (b) is the sum of
> (1)      any withdrawals since the last previous monthly deduction day with interest to date; and
> (2)      the monthly deduction for the month which is then starting, if the date of calculation is a monthly deduction day.

146.    The only exceptions to the above language are: (a) the Trust UTD 12/28/1993 policy, which has a Fixed Account Value, Fund Account Value, and Accumulation Unit Value,

each which is determined by separate formulas; (b) The Harris Family Irrevocable Life Insurance Trust policy does not define Cash Value but uses a monthly formula to determine the Account Value; and, (c) the Alvis policy defines Cash Value slightly different but is determined on a monthly basis.

147.    Voya and Lincoln contend that they determine the COI attributable to the universal life policies subject to this lawsuit on a monthly basis, and that the COI is determined by a policyholder's age, sex, and rating classification.

148.    With respect to the premium class, for example, Plaintiffs N. Pace and Large-Gurin were in a "nonsmoker" class, and Plaintiff Swenson is categorized into a "Standard" premium class.[41]

149.    For the universal life insurance policies subject to this lawsuit, Aetna (now Voya) reserved to itself the right to adjust the monthly COI rates.  No policyholder can independently calculate the monthly deduction on his or her policy—meaning they cannot verify that the COI rate Voya charges them is accurate—because Voya does not disclose the equation it uses.  In fact, the only insight a policyholder has into the manner in which COI is determined is the following tortuous policy language:

> **Cost of Insurance**
> The cost of insurance on any monthly deduction day will be (1) multiplied by the result of (2) minus (3) where:
> (1)      is the Cost of Insurance Rate on that date, divided by 1000
> (2)      is the death benefit on that date, divided by 1.0036748
> (3)      is the cash value on that date before computing the monthly deductions for the Cost of Insurance for the policy and any waiver of premium rider.
>
> **Cost of Insurance Rate**
> The Monthly Cost of Insurance is based on the Insured's sex, attained age, and premium class.  Attained age means age on the birthday nearest the first day of the policy year in which the monthly

---

[41] *See* Monte M Swenson Aetna Policy, attached hereto as Exhibit 5, p. 3.

deduction day occurs.  For the Initial Specified Amount, the premium class on the Date of Issue will be used.  For each increase, the premium class for that increase will be used.

The monthly Cost of Insurance rates may be adjusted by AEtna from time to time.  Adjustments will be on a class basis and will be based on AEtna's estimates for future cost factors, such as mortality, investment income, expenses and the length of time policies stay in force.  Any adjustments will be made on a uniform basis.  However, the rate during any policy year may never exceed the rate shown for that year in the Table of Guaranteed Maximum Insurance Rates in this policy.  Those rates are based on the 1958 Commissioners Standard Ordinary Mortality Table, male or female.[42]

150.    Additionally, correspondence sent by Lincoln National Life to policyholders has defined COI as "the mortality charge for the risk covered by the policy."[43]

151.    Even the most capable policyholder, reading her policy with excruciating care, cannot determine what her COI charges should be at any given period.  Instead, she must fully rely on Voya to accurately calculate the COI for her policy and to alert her to any adverse conditions that would negatively affect her expectations for the policy.

### 3.    Lincoln Sends Annual Reports Indicating the Voya Policies Are Adequately Funded and Minimal Fees Are Charged

152.    Under the terms of the policies, Voya must send policyholders reports at least once during each policy year.

153.    These summaries are sent by Lincoln NY, and tell policyholders (a) the payments they have made, (b) the monthly expenses and cost of insurance deductions, (c) what interest has been credited to the policy's cash value, and (d) the rate at which interest has been credited.  The

---

[42] Ex. 3, p. 7.

[43] *See* Nov. 20, 2015 Letter from Lincoln National Life to Monte Swenson Re Balance Due Notification, attached hereto as Exhibit 6.

annual statements do not tell policyholders what their COI rate is, but rather simply provide the COI charge.

154.    Over the years, Plaintiffs' annual statements, stated that the policies were performing as they had been marketed.  Most experienced accumulated account value increases each month through June 2016.

### 4.    Defendants Implement Drastic COI Increases to Generate Cash and Cause Lapse

155.    At no time between the policies' effective date and June 2016 did Defendants make any statement to policyholders that would indicate that the policies' "experience" was failing to meet Voya's (or Lincoln NY's) original expectations.  Every public representation Defendants made indicated that the companies were performing strongly, reducing costs, and outperforming the market.

156.    Despite the stream of information from Defendants that painted them as the picture of well-performing insurers, Lincoln announced, through a bulletin distributed to agents and brokers only sometime prior to May 9, 2016, that effective June 1, 2016, Lincoln would increase COI for several universal life plans issued by Aetna, for which Lincoln NY acts as administrative agent and reinsurer.[44]

157.    Neither Lincoln NY nor Voya notified the affected universal life policyholders that their COI charges would dramatically increase until two weeks prior to the monthly deduction reflecting the increase.  The letter sent to Plaintiffs and policyholders did not explain why the COI charges were increasing, other than the fact that "lower investment income and elevated costs are expected," and it did not give any further insight into how COI was calculated.[45]

---

[44] Ex. 1.
[45] Ex. 2.

### 5. Defendants Misrepresent the True Reasons Behind the COI Increase

158. According to policy language, a Voya policy's finances depend on the interaction of several variables. To administer the policies, Defendants make monthly deductions and monthly deposits to the accounts. This requires Defendants to review and update the non-guaranteed (*i.e.*, variable) elements of the policies—COI, interest paid on the policy's cash value, and the monthly expense—on a monthly basis. The policies specifically state that any changes in the COI are "on a class basis and will be based on Aetna's estimates for ***future*** cost factors . . . ." (Emphasis added).

159. At some point before June 1, 2016, and likely not long after the start of the Great Recession in 2008, Defendants realized that a combination of "lower investment income and higher reinsurance costs" along with other "material changes in future expectations of key cost factors" required Defendants to increase the COI rate. This contention is reflected in a "Summary of Changes" bulletin sent to Lincoln Benefit Life brokers and agents regarding the Voya policies at issue.[46]

160. If Defendants' claims are true, they should have realized almost ten years ago that the COI charges did not adequately account for future experience. Nonetheless, they chose to lull policyholders into a false belief that their policies were performing adequately and that they should continue to pay excess premiums and build the policies' cash value.

161. During this time that Defendants apparently believed that the policyholders should have been paying higher COI rates than they were, yet they continued to send annual statements that Defendants knew to be false to encourage policyholders to rely on their universal life policies for future death benefits.

---

[46] Ex. 1.

162.    Had Defendants notified Plaintiffs as soon as they realized that they had made a unilateral mistake accounting for "future expectations," the Plaintiffs would have been in a better position to respond to Defendants' mistake.  They could have attempted to purchase life insurance elsewhere, they could have reduced their premium payments to the minimum required premium and stopped adding to the policies' cash values, or they could have surrendered their policies for the available proceeds.

163.    Moreover, had Defendants increased Plaintiffs' COI as soon as they realized the policies were not performing as expected, Defendants may have avoided breaching Plaintiffs' policy contracts by recouping prior losses.

164.    During the period when Defendants knew of their claimed mistake but concealed it, the Plaintiffs' damages increased as their ability to purchase life insurance elsewhere diminished and they continued to increase their policies' cash values, only to have the cash value raided by Defendants beginning in June 2016.

165.    In fact, Defendants were aware of (and likely intended)[47] this result, stating in the communication to agents and brokers that "the increase COI charge will increase the monthly deduction, which will lower the policy's future cash value and may shorten the length of time the policy will stay in force without increased premiums."[48]

166.    Defendants offered multiple suggestions for agents to give policyholders faced with the COI increase.  Policyholders could: (1) "continu[e] to pay the current planned periodic premium for a potentially shorter coverage period and/or reduced policy Cash Value;" (2) "pay[]

---

[47] *See* Sussman, *supra* note 39 ("One cannot help but wonder if these rate increases were really designed to cull a significant portion of insureds from carriers' portfolios.  There is no question that a policy that lapses or is surrendered with diminished value is the insurer's best path towards renewed profitability.  Unfortunately for the insured's and their families, they will lose everything they saved over the last 17 or so years.").
[48] Ex. 1.

additional premiums;" (3) "reduc[e] the specified face amount"; or (4) submit "1035 exchanges".[49] Regardless of the option chosen by the policyholder, Defendants benefit substantially.

167.    In so raising the COI rate, Defendants did not consider the interest of their policyholders.  Its willful decision to allow the policyholders' damages to escalate to a point where many policyholders would have no choice but to forfeit their policies or allow their cash value to be eroded is tantamount to an attempt to cancel the policies and/or raid the policies of accumulated policyholder savings.

168.    These increases are the direct result of Defendants' participation in complex captive reinsurance transactions that freed up significant capital that was then up-streamed as dividends to Voya Financial and Lincoln National Corp., essentially paying out many billions of dollars that could have been used to stabilize the carrier financials and prevent them from having to raise COI rates.[50]

**E.    Universal Policies at Issue**

169.    Each of Plaintiffs' respective policy included a projected account value, based on the payment of excess premiums and planned interest.  The policies enjoyed a minimum guaranteed 4.5% annual interest accrual on the account cash value.

170.    Each Plaintiff paid their monthly premium for all relevant periods.

---

[49] *Id.*

[50] Sussman, *supra* note 39; *see also* COI Rate Risk: an analysis of the cause and effect, p.7 CAMBRIDGE GUARANTEE GROUP (Dec. 2016); Mary Williams Walsh, *Why Some Life Insurance Premiums Are Skyrocketing*, THE NEW YORK TIMES (Aug. 13, 2016), https://www.nytimes.com/2016/08/14/business/why-some-life-insurance-premiums-are-skyrocketing.html?_r=1.

1.      **Plaintiff Monte Swenson**

171.    Plaintiff Monte Swenson purchased a universal life policy from Aetna, policy number G1208751, in 1988.  Plaintiff Swenson's policy provides a $100,000 death benefit coverage.

172.    The planned monthly premium for Mr. Swenson's policy was $102.90, however both Lincoln NY *and* Lincoln National Life sent Mr. Swenson multiple letters over the life of the policy, requiring him to increase his premiums to keep the policy in force.

173.    In June 2016, the COI charged for policy G1208751 increased dramatically.  The monthly COI jumped from $277.90 to $418.04, an increase of $140.14 per month.

174.    According to an updated illustration provided by Lincoln NY and Voya, as of December 21, 2016, Plaintiff Swenson had paid $43,713.58 in premiums.  Additionally, the illustration for Mr. Swenson's policy demonstrated that due to the drastic COI increase, the policy would lapse in less than a year, even if paying a monthly premium of $511.45.  Another illustration provided in the same correspondence demonstrated that even if Plaintiff increased his monthly premium to $564.72, the policy would lapse in less than four years.

2.      **Plaintiff Wilbur Pace**

175.    Plaintiff W. Pace purchased a universal life insurance policy, from Aetna, policy G1071375, on December 15, 1986.  The policy provides a $50,000 death benefit coverage.

176.    Mr. W. Pace paid his quarterly premiums of $328.50 in accordance with the contractual obligations for all relevant periods.

177.    In June 2016, the COI charged for policy G1071375 increased dramatically. Plaintiff W. Pace's monthly COI jumped from $432.89 to $611.58, and has increased on a monthly basis $4-$9 per month since that time.

178.    According to an updated illustration provided by Lincoln NY and Voya, as of August 14, 2016, Plaintiff W. Pace had paid $49,876.30 in premiums for a $50,000 death benefit.

179.    Plaintiff Pace has witnessed his Account Value drop from $6,008.44 in December 2015 to $1,109.82 after the COI increase.  The new Voya illustration provided by Lincoln in August 2016 projects his Account Value to dwindle to $376 at the end of 2016 and then to completely disappear during 2017, thereby causing his policy to lapse.

3.      **Plaintiffs Noah and Christopher Pace**

180.    Plaintiff Noah Pace purchased a universal life policy from Aetna, policy number G1087960, in 1987.  Plaintiff Christopher Pace became the owner and payor of the policy on or about 2009-2010.  The policy provides a $100,000 death benefit coverage.

181.    Mr. N. Pace and subsequently Mr. C. Pace paid over and above the monthly premiums of $156.00 in accordance with the contractual obligations for all relevant periods. Plaintiffs N. and C. Pace were paying $415 per month in the past year—$269 per month in excess of his monthly premiums to ensure higher cash value and ensure coverage past the guaranteed value projections issued upon procurement of his policy.

182.    In June 2016, the COI charged for policy G1087960 increased dramatically by forty percent.  Plaintiffs' monthly COI jumped from $386.56 to $587.25, an increase of $200.69 per month.

183.    According to an updated illustration provided by Lincoln NY and Voya, as of December 16, 2016, Plaintiff N. and C. Pace had paid $51,901.82 in premiums.  Additionally, the December 2016 illustration demonstrated that even by drastically reducing the death benefit from $100,000 to $25,000, the policy would lapse within three years.

184.     Plaintiffs N. and C. Pace have witnessed their Account Value drop from $1,132.60 in April 2016 to $1.41 in January 2017 due to the COI increase.  The policy has entered a grace period twice, due to the massive COI increase, and Plaintiffs struggle to meet the COI increase.

185.     An October 27, 2016 letter required Plaintiffs to pay $1,317.52 in order to keep the policy in force through January 2017.  Plaintiffs are unable to afford the drastic increase in their cost of insurance in addition to their monthly premium and therefore their policy entered a grace period prior to lapsing.

### 4.     Plaintiff Louise Large-Gurin

186.     Plaintiff Large-Gurin purchased a universal life policy from Aetna, policy G1289284, in 1989.  The policy provides a $100,000 death benefit.  Ms. Large-Gurin paid her quarterly premiums of $154.50 in accordance with their contractual obligations for all relevant periods.

187.     In June 2016, the COI charged for policy G1289284 increased dramatically.  As of September 2016, the COI had jumped to $99.83, from $74.25 in May.  By dramatically increasing COI charges, Voya and Lincoln NY are raiding Ms. Large-Gurin's policy cash values and attempting to force her to surrender their policy.

188.     According to an updated illustration provided by Lincoln NY and Voya, as of July 25, 2016, Plaintiff Large-Gurin had paid $16,201.97 in premiums.  Additionally, the July 2016 illustration demonstrated that due to the drastic COI increase, the policy would lapse within ten years.  Another illustration provided in the same correspondence demonstrated that even if Plaintiff increased her quarterly premium from $154.50 to $656.88, then the policy would lapse within nineteen years.

5.      **Plaintiff Elizabeth Kantor**

189.    Plaintiff Kantor purchased a universal life policy from Aetna, policy G1499283, in 1992.  The policy provides a $25,000 death benefit coverage.  Ms. Kantor paid her quarterly premiums of $84.75 in accordance with the contractual obligations for all relevant periods.

190.    In June 2016, the COI charged for policy G1499283 increased dramatically up to 55% percent.  Ms. Kantor's COI increased from approximately $30 a month to $57 a month.

191.    According to an updated illustration provided by LNY and Voya, as of June 30, 2016, Ms. Kantor had paid $8,136.00 in premiums.  Additionally, the June 2016 illustration demonstrated that by continuing to pay her current premium of $84.75 per quarter her policy would lapse in eight years. Even by drastically increasing her premiums to $278.06 per quarter, the policy life would only extend by fifteen years.  Plaintiff Kantor has witnessed her Account Value drop on a monthly basis due to the COI increase.

6.      **Plaintiffs Royal Alvis, Jr., Ann Engles, and Kimberly Rosario**

192.    Plaintiffs Alvis, Engles, and Rosario are the policyholders for their parent's universal life policy purchased from Aetna, policy G1542981, in 1993. The policy provides a $1 million death benefit coverage.  Premiums have been paid in accordance with contractual obligations for all relevant periods.

193.    In June 2016, the COI charged for policy G1542981 increased dramatically by 40 percent.

7.      **Plaintiffs Jess Harris III and Susan Reed as trustees for The Harris Family Irrevocable Life Insurance Trust**

194.    Plaintiffs Jess Harris III and Susan Reed are the trustees for policyholder The Harris Family Irrevocable Life Insurance Trust. This Trust owns a universal life policy from Aetna, policy G1582654, purchased in 1995. The policy provides a $1.5 million death benefit coverage. Premiums have been paid in accordance with contractual obligations for all relevant periods.

195.     Beginning in June 2016, the COI increased by 15 percent.

**8.     Plaintiff Natalie C. Mackie, as trustee for Trust UTD 12/28/1993**

196.     Plaintiff Natalie C. Mackie is the trustee for Trust UTD 12/28/1993. The Trust is the policyholder for a universal life policy from Aetna, policy F152818, purchased in 1998.  The policy provides a $1.5 million death benefit coverage.  Premiums have been paid in accordance with contractual obligations for all relevant periods.

197.     Beginning in June 2016, the COI increased by 40 percent.

**9.     Plaintiffs Michail and Louisa Kerhoulas**

198.     Plaintiffs Michail and Louisa Kerhoulas are policyholders for two universal life policies purchased from Aetna, policies U1107707 and G1062992. Policy U1107707 was purchased in 1984 and policy G1062992 was purchased in 1986. Policy U1107707 provides a $150,000 death benefit and policy G1062992 provides a $50,000 death benefit. Premiums have been paid in accordance with contractual obligations for all relevant periods.

199.     Beginning in June 2016, the COI increased on policy U1107707 and policy G1062992 by at least 35 percent.  This increase has resulted in at least policy G1062992 entering a grace period prior to lapsing on multiple occasions before Plaintiffs were required to pay higher premiums to maintain the policy.

**10.     Plaintiff Laura Wheeler**

200.     Plaintiff Laura Wheeler is the policyholder for a universal life policies from Aetna, policy G1482164, purchased in 1992.  The policy provides a $25,000 death benefit coverage. Premiums have been paid in accordance with contractual obligations for all relevant periods.

201.     Beginning in June 2016, the COI increased by 55 percent. This increase has resulted in Plaintiff Wheeler's policy entering a grace period prior to lapsing on multiple occasions before Plaintiff was required to pay higher premiums to maintain the policy.

11.   **Impact on Plaintiffs' Policies**

202.    Each of Plaintiffs' respective policies states that any changes in the COI are "on a class basis and will be based on Aetna's estimates for ***future*** cost factors . . . ."[51]

203.    Despite the COI letter from Lincoln NY (acting as administrative agent for Voya) to Plaintiffs stating that their COI increase was due to "lower investment income and elevated costs," Lincoln's internal communication states that COI is increased due to "lower investment income and ***higher reinsurance costs***," based on an actuarial analysis.[52]

204.    The COI increases on these policies are drastic and unprecedented in the history of these policies.  COI is being increased from 15% to 55%, depending upon the policy block.

205.    Lincoln and Voya are increasing the COI because they are financially unstable— a fact they have cleverly hidden through a captive reinsurance scheme—and to fund exorbitant dividend payments to their parent corporations.  By dramatically increasing COI charges, Lincoln NY and Voya are raiding Plaintiff's policies' cash value and attempting to force them to surrender the policy.

206.    Because the monthly premiums Plaintiffs are paying is now less than the COI charges (while the monthly premium payments have historically exceeded the monthly COI charges), Defendants are "paying" themselves the increased COI charges by taking money from the policies' accumulated cash values.

F.    **Defendants' Publicly Filed Financial Statements Demonstrate that the Defendants Justifications to Raise COI Rates Are Untrue**

207.    The story Defendants chose to tell the agents selling Aetna/ING/Voya products was markedly different than the story they wanted policyholders to hear.  Attached to the letter

---

[51] *See, e.g.*, Ex. 3.
[52] *See* Ex. 1 (emphasis added).

informing policyholders of the increase in their COI rates, was a document with a number of "Policy Owner Questions" and answers provided by Lincoln NY:

Policy Owner Questions

1.  **Why are Cost of Insurance (COI) rates increasing on my policy and what does that mean?**
    The expected cost of providing insurance coverage has risen, due to a variety of factors including lower investment income and higher expenses. COIs have been adjusted to appropriately reflect changes in these factors.

2.  **Are cost of insurance rates going up for all policies?**
    Yes, this action affects all policyholders holding the impacted products.

3.  **How much are the COI Rates going up?**
    The amount of the COI rate increases depends upon the product. In no instance will the revised COI rates exceed the guaranteed maximum COI rates indicated in your policy.

4.  **I have a bank draft systematic payment with Lincoln for my premiums. Will my premium payments automatically increase as a result of this change?**
    No, this is a flexible premium product, and therefore you will need to notify us if you decide to change your automatic premium payments.

5.  **Will this impact any policy guarantees?**
    No. The policy guarantees under your policy will remain the same as prior to the change.

6.  **Can I continue to pay my current premium, and if so, how will that impact my policy?**
    Yes, you can continue to pay your current premium, and as long as there is sufficient cash value, you can maintain your policy at the current specified face amount. However, it is important to note that at some point you may need to increase the amount of premium paid in order to keep your policy in force. The impact of this can be determined by requesting an *inforce illustration*. An illustration is an example of how your policy might perform under certain conditions. Illustration requests should be emailed to mylifeillustrations@lfg.com.

7.  **Will I need to increase my premium amount?**
    You may choose to increase your premiums if you want to achieve the same policy objectives that you had targeted prior to the COI increase. The best way to learn how much your premiums need to change is to ask for an *inforce illustration*. For fastest service, please email your request to mylifeillustrations@lfg.com.

8.  **What are the options other than paying additional premiums?**
    You may have the option to shorten the policy coverage period, reduce your face amount (subject to any minimum requirements and IRS rules), exchange for another policy or surrender your policy.
    -   Reduce the face amount to the level supported by your current premium – assuming it's above any minimum face amount requirements. If you would like to pursue this option, please contact us at mylifeillustrations@lfg.com.
    -   Policy surrender (cancellation of your policy) -- if you would like to pursue this option please send your request to mypolicysurrender@lfg.com. However, we do recommend that you speak with your advisor to fully understand your circumstances and options, which may have tax implications.

208.    Voya and Lincoln NY want policyholders to believe, and expressly say, that the COI increase is the result of "a variety of factors including lower investment income and higher expenses."

209.    The available data for Voya and Lincoln National Life, as a whole and for the specific policies affected by the COI increase, prove that Defendants' statements are false. Indeed, financial statements for Voya, Lincoln National Life and Lincoln NY reflect that their investment returns and costs associated with administering the insurance business have remained consistent.

210.    Ron Sussman, founder and chief executive officer of PolicyAudits.com and CPI companies, wrote an article describing Lincoln's COI increase on another block of policies: "when you dig into the financials of the companies that are announcing these increases, it becomes readily apparent that this is not about survival at all.  In most, if not all cases, these rate increases are being instituted to boost the return on investment on these older blocks of businesses."[53]

211.    In fact, over the past few years, Lincoln National Life has continuously represented to the Indiana Department of Insurance that its performance was so strong that Indiana should permit it to pay extraordinary dividends—more than $7.6 billion in dividends, in fact, which it paid to Lincoln National Corp.  Likewise, Voya represented to the Connecticut Insurance Department that its performance was also strong enough to support the payment of dividends to Voya Financial in the amount of $1.7 billion.

212.    Moreover, the public statements Defendants have made in recent years contradict their COI increase explanation.  For example, Voya's 2016 Third Quarter Report indicated a higher investment income than the prior year.[54]  And in its 2015 Annual Report, Voya Financial boasts that: "Our strong market positions have allowed us to properly scale our business to achieve greater profitability."[55]

213.    Additionally, Voya touted its reinsurance relationship with Lincoln by stating: "The S&P financial strength rating of our reinsurers with the two largest reinsurance recoverable balances are AA- rated or better.  These reinsurers are (i) Lincoln National Life Insurance

---

[53] Sussman, *supra* note 39.
[54] Voya Retirement Insurance and Annuity Company, Quarterly Statement (Sept. 30, 2016), http://s1.q4cdn.com/733568831/files/doc_financials/2016/q3/VRIAC_BB_Final_3Q16.pdf.
[55] Voya Financial, Inc., Annual Report, p. 21 (2015), http://s1.q4cdn.com/733568831/files/doc_financials/2015/annual/138420_006_web_clean.pdf.

Company and Lincoln Life & Annuity Company of New York, subsidiaries of Lincoln National

Corporation ("Lincoln") and (ii) Hannover Re."[56]

214.    Voya expresses confidence in the trust created by Lincoln, detailed above, but fails

to give shareholders and policyholders alike any concern for "higher costs"—much less higher

reinsurance costs—or lower investment income related to the relevant policies ceded to Lincoln:

> Effective October 1, 1998, the Company disposed of a block of its individual life
> insurance business under an indemnity reinsurance arrangement with a subsidiary
> of Lincoln National Corporation ("Lincoln") for $1.0 billion.  Under the agreement,
> Lincoln contractually assumed from the Company certain policyholder liabilities
> and obligations, although the Company remains obligated to contract owners.  The
> Lincoln subsidiary established a trust to secure its obligations to the Company
> under the reinsurance transaction.   Of the Reinsurance recoverable on the
> Consolidated Balance Sheets, $1.8 billion and $1.9 billion as of December 31, 2015
> and 2014, respectively, is related to the reinsurance recoverable from the subsidiary
> of Lincoln under this reinsurance agreement.[57]

215.    Lincoln National Corp. likewise bragged in its 2015 Annual Report:

> Notably, we continue to deliver consistent and profitable growth
> including:
> • Income from operations per share of $5.461 x Operating
> revenues of $13.9 billion reached a record level
> • Positive consolidated net flows in each quarter resulted in
> annual net flows of $6 billion, up 9 percent from 2014 x Assets
> under management totaled $219 billion, a year-end record
> • Book value per share, excluding AOCI, exceeded $52, up 6
> percent from 2014
> • Operating return on equity, excluding AOCI, was 11 percent
> • Capital returned to shareholders accelerated as share
> buybacks grew by 38 percent from 2014 coupled with a 25 percent
> increase in common stock dividends declared
> • Statutory capital as of year-end once again exceeded $8
> billion[58]

---

[56] *Id.* at 144.
[57] *Id.* at 274.
[58] Lincoln National Life, Annual Report to Shareholders (2015), https://www.lfg.com/wcs-
static/pdf/ar10k15.pdf.

216.    Pertinent to its life insurance business, Lincoln further claimed: "As we look forward, we remain confident that our key strategic objectives aimed at driving long-term, sustainable growth in our four business segments—Life Insurance, Annuities, Retirement Plan Services and Group Protection—are firmly intact. Importantly, these objectives and our financial plans are reviewed by our Board of Directors, and the Board shares management's optimism."[59] Lincoln fails to mention any concerns about investment income under the "Investment" section reporting on its life insurance business.[60]

217.    As recently as the third quarter of 2016, Lincoln stated: "Life Insurance reported income from operations of $167 million versus $36 million in the prior-year quarter.  Excluding notable items in both periods, earnings were consistent with the prior-year period.  Both quarters benefited from strong variable investment income."[61]

218.    Finally, Lincoln NY (administrative agent for the relevant Voya policies) clearly demonstrates in its 2015 GAAP statement that Lincoln did not have any concerns regarding investment income and its life insurance business: "Based upon this evaluation as of December 31, 2015, management believes we have the ability to generate adequate amounts of cash from our normal operations (*e.g.*, insurance premiums and fees and investment income) to meet cash requirements with a prudent margin of safety without requiring the sale of our temporarily-impaired securities."[62]

---

[59] *Id.*
[60] *Id.* at 9.
[61] *Lincoln Financial Group Reports Third Quarter 2016 Results and Announces Increase in Dividend*, LINCOLN NATIONAL CORPORATION, p. 3 (Nov. 2, 2016), available at: https://www.lfg.com/wcs-static/pdf/3Q%20earnings%20press%20release.pdf.
[62] Financial Statements, Lincoln Life & Annuity Company of New York (Dec. 31, 2015 and 2014), https://www.lfg.com/wcs-static/pdf/2015%20Lincoln NY%20GAAP.pdf.

219.    Nowhere in Defendants' public statements do they express concern for investment income or higher costs—much less higher reinsurance costs—that would impact the policies involved in this litigation.

220.    Furthermore, Lincoln's claim that "higher reinsurance costs" in its Summary of Changes document[63] as a reason for the massive COI increase is unbelievable, considering that ***Lincoln is the reinsurer*** for the Voya policies at issue.  In other words, at face value, Lincoln manufactured the COI increase simply to increase its profits as reinsurer of the Voya policies in question.

221.    Further, if Lincoln exercised its option under the trust agreement with Voya to reinsure part or all of its liabilities, Lincoln would control the reinsurance costs for its own captives. Any "higher reinsurance costs" are completely manipulated by Lincoln, and are thus merely a façade to increase COI.

222.    The above shows that the explanations Defendants have given for significantly increasing COI charges are false.  Instead, on information and belief, Defendants increased COI to accomplish two goals: (1) generate cash to fund extraordinary and regular dividend payments to Voya Financial and Lincoln National Corp. and their shareholders—specifically to raid the affected policies for their accumulated cash value in order to fund ever increasing dividend demands from Voya Financial and Lincoln National Corp., and (2) to rid itself of billions of dollars of liabilities coming due over the next 15 years.

---

[63] Ex. 1.

## V.  RICO ALLEGATIONS

### A.      Standing, Injury, and Proximate Cause

223.     Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).  Defendants, their captives and affiliated companies and the other Enterprise Associates are "persons" within the meaning of 18 U.S.C. § 1961(3).

224.     Plaintiffs have sustained injury to their business or property by reason of the acts and the conduct of Defendants alleged in this Complaint, including their loss of money due to their payment of excessive premiums, by having their account values reduced by the charging of excessive cost of insurance rates, and by having their policies either lapse or surrendering them, thereby losing the benefit of the guaranteed rates and coverage.

225.     Plaintiffs suffered concrete damages by having to pay an unwarranted and meritless cost of insurance increase.  For example, Plaintiff C. Pace sustains damages of approximately $269 per month, representing the increased COI charges caused by Defendants' wrongful conduct.

226.     In addition, Plaintiff C. Pace surrendered his policies before expiration of the pertinent surrender charge period have sustained additional damages in the form of surrender charges.

227.     Furthermore, Plaintiffs suffered concrete damages in the form of depleted account values and account values lower than those they should have accrued had Defendants not engaged in the fraudulent and manipulative practices alleged above.

228.     But for the conduct of Defendants alleged herein, Plaintiffs would not have been injured.

229.     The losses suffered by Plaintiffs were proximately caused by Defendants, as the alleged fraudulent scheme and enterprise was a direct and substantial factor in causing their injury. As in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the injury suffered by

Plaintiffs here was "a foreseeable and natural consequence of [Defendants] scheme" to increase COI rates in order to recoup their losses and pay shareholder dividends.  Moreover, there are no victims beyond Plaintiffs more directly injured by Defendants' scheme and enterprise who can be counted on to seek remedies under RICO.

230.   The harm suffered by Plaintiffs amounts to compensable injury caused by Defendants' conduct of an enterprise through a pattern of racketeering.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985).

231.   Plaintiffs were the targets of the RICO scheme.   They purchased policies underwritten and issued by Voya, and administered and reinsured by Lincoln, and continued to pay premiums and increased COI charges based on those Defendants' false express and implied representations of positive surplus and financial strength and stability and that these charges are due to increased future costs, a patently false assertion by Defendants.

232.   In addition, Plaintiffs were injured by the overt acts taken by Defendants and their affiliates and unaffiliated entities in furtherance of their conspiracy to violate Section 1962(c) which are themselves predicate acts, including the generation of bogus reinsurance credits used to depict the Defendants as having positive surplus when these companies were actually insolvent by hiding liabilities through a serious of fraudulent transactions among the Defendants, fraudulently overstating assets in violation of statutory accounting rules, and fraudulently recouping past losses through increasing the cost of insurance under the pretense of increased future costs.

**B.     The Alleged Association-in-Fact RICO Enterprise**

233.   The following group of individuals associated-in-fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) to charge massive COI increases on policies insured by Voya and reinsured and administered by Lincoln while concealing their true financial condition and the true reasons for those massive COI increases:

- Voya Retirement Insurance & Annuity Company;

- Voya Financial, Inc.;

- Lincoln National Life Insurance Company;

- Lincoln Life & Annuity Company of New York; and

- Lincoln National Corporation.

This association-in-fact is referred to herein as the "RICO Enterprise," and its constituents the "Enterprise Associates."

234.   As set forth herein, the RICO Enterprise has an ascertainable structure that is separate and distinct from the persons that constitute the enterprise and it is separate and apart from the pattern of racketeering activity alleged herein.

235.   As alleged more fully below, the Enterprise Associates conducted the affairs of the RICO Enterprise through a pattern of racketeering activity.  The Enterprise Associates fraudulently concealed and conspired to fraudulently conceal (1) the true financial condition and financial instability of Voya Financial and Lincoln National, and (2) the true reasons for the increased COI charges on the insurance products underwritten and issued by Voya and reinsured and administered by Lincoln National and Lincoln NY.

236.   As a direct result of this fraudulent scheme, Defendants were able to and did charge Plaintiffs excessive COI premiums for their insurance products, and Plaintiffs paid excessive COI premiums they should not have had to pay based on false representations by Voya and Lincoln as to the true nature of the charges.

237.   The alleged RICO Enterprise has a sufficiently ascertainable structure in that it has (1) a purpose, (2) relationships among the associates, and (3) longevity sufficient to achieve its purpose.  *Boyle v. United States*, 129 S. Ct. 2237 (2009).

1.      **Purpose of the RICO enterprise.**

238.    The RICO Enterprise is an ongoing and continuing organization of companies associated for the common or shared purpose of defrauding consumers by fraudulently charging increased COI premiums while concealing both the true reason for those increases and the Defendants' troubled financial condition and financial instability in order to continue reaping the financial rewards and funnel money out of Voya and Lincoln NY and Lincoln National Life to their upstream affiliates and Enterprise Associates.

239.    The RICO Enterprise functioned, in part, by deceiving Plaintiffs regarding the true reasons for the increased COI charges.  Through this ruse to promote and effectuate a scheme to increase revenue from existing policyholders to fund past and future distributions out of Voya and Lincoln NY and Lincoln National Life, and to even cause these policies to lapse so as to remove the underlying insurance liabilities for these products, the Enterprise Associates have, through the RICO Enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenues for Voya and Lincoln National and their affiliates.

2.      **Relationships Among Separate and Distinct Associates**

240.    To pull off this scheme, Voya had to create and operate Security Life of Denver International Limited ("SLDIL"); Roaring River, LLC, ("RR"); Roaring River II, LLC, ("RR II"); Roaring River IV, LLC, ("RR IV"); and Langhorne I, LLC, ("L I") ("the Voya Captives"). Additionally, Lincoln National Life and Lincoln NY had to create and operate Lincoln Reinsurance Company of Vermont I ("LRCV I"); Lincoln Reinsurance Company of Vermont III ("LRCV III"); Lincoln Reinsurance Company of Vermont IV ("LRCV IV"); and Lincoln Reinsurance Company of South Carolina ("LRCSC") (the "Lincoln Captives").

241.    These financial captives are an integral part of the scheme because their finances are not publicly disclosed under state law, and these entities enabled the RICO Enterprise's

unlawful activity to artificially inflate surplus and RBC, fraudulently misrepresent to the public and policyholders the true impact of their paying large dividends to funnel money out of Voya and Lincoln National Life and Lincoln NY to its upstream affiliates and Enterprise Associates, and fraudulently misrepresent and conceal the true reason for the substantial increases in COI charges Defendants demanded Plaintiffs pay.

242.   The decision to use these entities to misrepresent the true financial condition of Voya, Lincoln National Life, and Lincoln NY not only facilitated but enabled the RICO Enterprise's unlawful activity; Defendants used the separately incorporated nature of these entities to perpetrate the fraudulent scheme and the acts of mail and wire fraud that were at the center of that scheme.

243.   Each associate of the RICO Enterprise has an existence separate and distinct from its participation in the racketeering activities of the RICO Enterprise.  Each alleged entity associate is organized as a separate company, with separate boards, separate books and records, separate accounts and separate existences for legal and regulatory purposes.

244.   Because the Voya Captives and Lincoln Captives were created to facilitate the scheme, the RICO Enterprise has an existence and structure that is separate and distinct from other affairs of its members.  Moreover, Voya did not own the Lincoln Captives, and Lincoln did not own the Voya Captives, and those entities engaged in business operations separate and apart from their activities on behalf of the RICO Enterprise alleged herein.

245.   Members of the RICO Enterprise engage in business operations separate and distinct from other affairs of its members and separate and apart from their activities on behalf of the RICO Enterprise.  For example, and in addition to the facts pled above in this Complaint:

- Voya Financial owns Voya, an insurance company selling insurance and annuity products to consumers around the United States;

- Lincoln National Corp. owns Lincoln NY and Lincoln National Life, insurance companies selling insurance and annuity products to consumers around the United States;

- Voya Financial is publicly traded on the New York Stock Exchange under the symbol "VOYA";

- Lincoln National Life is publicly traded on the New York Stock Exchange under the symbol "LNC";

246.   The Enterprise Associates nevertheless became associated with the RICO Enterprise, and conducted or participated in the affairs of the RICO Enterprise in addition to their own affairs.  The activities in which the associates of the RICO Enterprise engaged facilitating the racketeering activities are not, however, ordinary legitimate business activities and, in fact, were unlawful and would be inimical to the interests of the RICO Enterprise members.

247.   Each member of the RICO Enterprise has a different and clearly defined role and relationship in the conduct of the affairs of the RICO Enterprise, and as alleged above, all the associates took some part in directing the RICO Enterprise's affairs:

- As more fully set forth above, the Voya and Lincoln Captives served as corrupt "captive" entities that were created to accept ceded liabilities from Voya and Lincoln, respectively, and artificially boost RBC despite their lack of independent payment ability.  The secrecy of the finances of these captives allowed Defendants to conceal the fraudulent scheme.

- As more fully set forth above, Voya Financial, Voya, and their affiliated entities profited from the scheme by taking over $1.7 Billion in dividends that otherwise would have been used to offset existing insurance liabilities, all the while pretending the company was valuable, solvent and capable of meeting its future obligations.

- As more fully set forth above, Lincoln and their affiliated entities profited from the scheme by paying over $7.6 Billion in dividends that otherwise would have been used to offset existing insurance liabilities, all the while pretending the company was valuable, solvent and capable of meeting its future obligations.

- As more fully set forth above, Voya and Lincoln agreed to impose massive COI increases on Voya's policyholders in order to collect more money from policyholders, reduce the account values of policyholders, or cause these policyholders to either lapse or surrender their policies (or any combination of these things), while concealing from policyholders and the public the true reasons for these massive COI increases.

248.    In these ways and others, each of the Enterprise Associates directly or indirectly participated in, or managed aspects of, facilitated or otherwise took some part in directing the unlawful activities comprising the RICO Enterprise's affairs.

249.    The cooperation exhibited by the members of the RICO Enterprise fell outside the bounds of the parties' normal commercial relationships and was undertaken to advance the corrupt purposes of the RICO Enterprise.

250.    The RICO Enterprise's decision to operate through the Voya Captives and Lincoln Captives thus facilitated its unlawful activity.  The Enterprise Associates consciously used the separate corporate forms of the Voya Captives and Lincoln Captives in order to make the fraudulent scheme harder to detect and better conceal the true nature of the COI increases and the extent of their misrepresentations and wrongdoing.

**3.    Continuous Existence**

251.    The RICO Enterprise has had an ongoing and continuous existence sufficient to permit the Enterprise Associates to pursue the RICO Enterprise's purpose.  members of the RICO Enterprise associated in fact increase the COI charges while concealing the true reasons for those increase and their true financial condition, on an ongoing rather than *ad hoc* basis.

252.    No Associate of the RICO Enterprise could have accomplished the goals of the scheme on its own initiative.

253.    The RICO Enterprise has displayed a continuity of membership exceeding two years, during which time Enterprise Associates acted continuously in their respective roles in the RICO Enterprise.

254.    Each Enterprise Associate in the RICO Enterprise was aware of the scheme to misstate Voya's and Lincoln's true financial condition and to disguise the true reason for the COI charges being imposed on Plaintiffs was a knowing and willing participant in that scheme.

57

4.     **Interstate Commerce**

255.    The RICO Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the receipt of increased COI payments and the transmission of false information to Plaintiffs regarding the true reason for the COI increases.

C.    **Pattern of Racketeering Activity**

256.    As alleged above, both Voya and Lincoln consistently misrepresented their true financial condition and fraudulently misrepresented the true reason for the COI increases to Plaintiffs.

257.    Voya, Lincoln, and the other Enterprise Associates have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), as described above, within the past three years.  The Enterprise Associates have committed or aided and abetted in the commission of countless acts of racketeering activity, including but not limited to sending notices of the COI increases to Plaintiffs, communicating the false reasons for those increases with Plaintiffs, and collecting money from Plaintiffs.  Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiffs.

258.    The multiple predicate acts of racketeering activity that Voya, Lincoln, and the other Enterprise Associates committed and/or conspired to, or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**D.      Predicate Acts**

259.     Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

260.     For the purpose of executing and/or attempting to execute the above-described scheme, Voya, Lincoln, and the other Enterprise Associates, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, statements and other materials relating to the increased COI charges and the transmission to the public of false or materially misleading financial information in statements filed with the respective state regulators and the NAIC that disguised the true reason for the massive increase in COI charges.

261.     As alleged above, the Annual Statements submitted by both Voya and Lincoln National to the NAIC and its respective regulators from at least 2007 to 2016 included fraudulent or material representations of, among other things, the surplus and RBC these companies would have reported but for their departure from NAIC SAP standards.

262.     For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Voya, Lincoln, and the other Enterprise Associates, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, reductions in the account value of Plaintiffs, wire transfers by and among affiliates for purposes of funneling cash out of the companies and moving liabilities off balance sheet.  In addition, pursuant to and as part of the scheme to defraud, Voya, Lincoln, and the other Enterprise Associates intended that Lincoln

NY and/or Lincoln National Life would and did receive payments from Plaintiffs that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

263.    Voya, Lincoln, and the other Enterprise Associates aided and abetted violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. § 2.

264.    Many of the precise dates of the RICO Enterprise's fraudulent use of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to the books and records of Voya, Lincoln, and the other Enterprise Associates.  Indeed, the success of the scheme depended upon concealment, and Voya, Lincoln, and the other Enterprise Associates have withheld details of the scheme from the Plaintiffs.  Generally, however, Plaintiffs can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme.  They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

- creating the Voya Captives and Lincoln Captives;

- entering into reinsurance agreements with the Voya Captives and Lincoln Captives (including the reinsurance agreements cited above in this Complaint);

- maintaining the reinsurance agreements between Voya and Lincoln NY and Lincoln National Life cited above in this Complaint);

- transmitting and receiving promotional materials extolling Voya and Lincoln's purportedly positive surplus, stable financial condition and A.M. Best rating;

- transmitting false or materially misleading financial statements that hid the true reason for the COI increases to the respective state regulators and to the NAIC (including the Annual Statements cited above in this Complaint);

- transmitting false statements to Plaintiffs that misrepresent the true reasons for the massive COI increases (including the May 31, 2016 letter attached as Exhibit 2); and

- processing premium payments received from the policyholders, including those received from Plaintiffs.

265.    Plaintiffs in particular received statements in the mail from Voya and Lincoln regarding the massive COI increases, communicated with Voya and Lincoln by mail about the massive COI increases, and paid money to Voya and Lincoln to cover the massive COI increases by either mailing checks or electronic debiting of their bank accounts.  Voya, Lincoln, and the other Enterprise Associates used "dishonest methods or schemes" involving "the deprivation of something of value by trick, deceit, chicane or overreaching."  *McNally v. United States*, 483 U.S. 350, 358 (1987).

266.    The omissions of material facts, acts of concealment, and failures to disclose of Lincoln, Voya, and the other Enterprise Associates were knowing and intentional, and made for the purpose of deceiving Plaintiffs into paying for the massive COI increases.  Voya, Lincoln, and the other Enterprise Associates either knew or recklessly disregarded the fact that their omissions and misrepresentations were material and were relied upon by Plaintiffs as shown by their payments of the COI increases or surrender of their policies.

267.    Although not necessary to make out a violation of the mail or wire fraud statutes, Plaintiffs relied, to their detriment, on the alleged fraudulent material omissions and misrepresentations of Voya's and Lincoln's true financial condition and true reason for the massive COI increases. Reliance by at least some of Voya's policyholder allowed Voya and Lincoln to charge the excessive COI increases, injuring all policyholders.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).

268.    Voya, Lincoln, and the other Enterprise Associates knew Plaintiffs relied on their misrepresentations and omissions concerning the true financial condition of Voya and Lincoln and the true reasons for the massive COI increases, and knew that Plaintiffs would incur substantial loss as a result.  Accordingly, Voya and Lincoln have obtained money and property belonging to

the Plaintiffs, and Plaintiffs have been injured in their business or property by the overt acts of

mail and wire fraud of these Defendants and the other Enterprise Associates, and by their aiding

and abetting each other's acts of mail and wire fraud.

## VI.  COUNTS

### COUNT ONE
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION 1962(c)
### (Against all Defendants)

269.   Plaintiffs repeat and reallege all allegations contained in Sections I through V

above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

270.   This claim arises under 18 U.S.C. §1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect, interstate
> or foreign commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs through a
> pattern of racketeering activity . . . .

271.   In violation of 18 U.S.C. § 1962(c), Defendants and the other Enterprise Associates

have conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO

Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5).

Therefore, Defendants and the other Enterprise Associates have violated 18 U.S.C. § 1962(c).

272.   The injuries of Plaintiffs were directly and proximately caused by the alleged

racketeering activity.

273.   As a result and by reason of the foregoing, Plaintiffs have been injured, suffered

harm, and sustained damage to their business and property, and are therefore entitled to recover

actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to

18 U.S.C. § 1964(c).

### COUNT TWO
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION 1962(d)

**(Against all Defendants)**

274.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

275.    This claim arises under 18 U.S.C. § 1962(d), which provides in relevant part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."

276.    In violation of 18 U.S.C. § 1962(d), Defendants and the other Enterprise Associates conspired to defraud the Plaintiffs of their money and property through excessive COI charges pursuant to the pattern of racketeering activity and the fraudulent scheme described above. Defendants and the other Enterprise Associates agreed to conduct or to participate in the affairs of the enterprise and agreed to commit at least two of the predicate acts identified above.

277.    The injuries of Plaintiffs were directly and proximately caused by the alleged racketeering activity.

278.    As a result and by reason of the foregoing, the Plaintiffs have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE**
**BREACH OF CONTRACT**
**(Against Voya, Lincoln National Life, and Lincoln NY)**

279.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

280.    Plaintiffs each entered in a contract with Voya when they purchased their life insurance policies.   Lincoln NY and Lincoln National Life act as Voya's agent in the administration of this contract.

281.     Throughout the life of each respective life insurance policy, Plaintiffs have paid to Defendants all premiums and charges due under the policies as set forth at the time of execution of the policies, and Plaintiffs have performed all obligations and conditions under the policies.

282.     Under the life insurance policies, Defendants owed and continue to owe duties and obligations to Plaintiffs.   Among these duties is the duty to properly administer the policy consistent with the terms and obligations set forth within the respective life insurance policies. This includes the duty to determine the correct monthly deduction from a policyholder's account, the duty to notify policyholders in a timely manner whenever Defendants believed a policy's COI expenses increased; and to refrain from increasing the COI except under very specific conditions.

283.     Defendants materially breached the terms of the life insurance policies and its duties to Plaintiffs under the policies when they:

a.     instituted unreasonable COI increases for purposes not authorized under the life insurance policies;

b.     failed to determine the correct monthly deduction from the life insurance policies' accounts in accordance with the policies' terms and conditions;

c.     failed to notify policyholders as soon as Defendants determined that their "expectations" for the life insurance policies were inaccurate and that the policies were not performing sufficiently and required an increase in COI;

d.     failed to determine in a reasonably timely manner that the life insurance policies were not charged the appropriate COI;

e.     failed to maintain adequate assets backings reserves sufficient to make good on its obligations under the policies; and

f. failed to administer and/or maintain said policies consistent with Defendants' inherent duties of good faith and fair dealing implied in the performance of every contract.

284. As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial. The aforementioned damages include, but are not limited to, the diminished value in Plaintiffs' life insurance policies; the improper increased cost of insurance premiums; and any damages suffered by Plaintiffs from not having the opportunity to pursue and secure alternatives to the diminished life insurance policies at issue that occurred due to their reliance on the representations of financial solvency of the life insurance policies by Defendants.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(Against all Defendants)**

285. Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

286. Plaintiffs conferred benefits upon Defendants; specifically, paid money in the form of premiums and excess premiums to fund their life insurance policies, and Defendants used those funds to earn investment income and to pay extraordinary dividends to Voya Financial, Lincoln National Corp., and ultimately Voya Financial's and Lincoln National Corp.'s shareholders.

287. Defendants knew that they were enjoying such benefits from the Plaintiffs' premium and excess premium payments.

288. Defendants misused the benefits Plaintiffs conferred on them by engaging in the above-described schemes to pay extraordinary dividends to Voya Financial, Lincoln National Corp., and Voya Financial's and Lincoln National Corp.'s shareholders.

289.     Defendants chose not to inform Plaintiffs that their "expectations" for the subject universal life insurance policies were not being met as soon as they knew such information, causing Plaintiffs to continue make premium and excess premium payments to the Plaintiffs' detriment.

290.     Defendants have unlawfully raided Plaintiffs' cash value accounts under the guise of a justified contractually mandated increase in COI.

291.     Actions of Defendants have caused policyholders to abandon their universal life insurance policies without receiving the benefit of said policies.

292.     Actions of Defendants have caused policyholders to rely on false statements Defendants have made and, as a result, permit the Defendants to raid their policies' cash value.

293.     It is inequitable for Defendants to retain the benefits they have enjoyed from Plaintiffs' premium payments and excess premium payments.

294.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.  The aforementioned damages include, but are not limited to, the diminished value in Plaintiffs' life insurance policies; the improper increased COI premiums; and any damages suffered by Plaintiffs from not having the opportunity to pursue and secure alternatives to the diminished life insurance policies at issue that occurred due to their reliance on the representations of financial solubility of the life insurance policies by Defendants. Plaintiffs entitled to restitution for all premiums paid or, in the alternative, the unlawful and artificially inflated COI charges that Defendants have paid themselves from the policies' cash value.

## COUNT FIVE
### CONVERSION
### (Against all Defendants)

295.     Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

296.    On and before June 2016, Plaintiffs' had acquired significant cash values as part of their universal life insurance policies.

297.    Plaintiffs' policies' cash values were specific and identifiable, and were the Plaintiffs' personal property.

298.    Beginning in November 2016, and continuing every month thereafter, Voya, Lincoln NY, and Lincoln National Life caused money to be withdrawn from the Plaintiffs' cash value accounts and deposited into Defendants' accounts.

299.    Specifically, Voya, Lincoln NY, and Lincoln National Life were acting as agents of Voya Financial and Lincoln National Corp. in withdrawing funds from Plaintiffs' account values, in order to convert these funds into dividends to be paid to Voya Financial, Lincoln National Corp., and their shareholders.

300.    In so doing, Defendants have exerted ownership and dominion over the Plaintiffs' personal property in denial of the Plaintiffs' rights.

301.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## <u>COUNT SIX</u>
**FRAUD**
**(Against all Defendants)**

302.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

303.    Defendants have falsely stated to Plaintiffs' that Voya, Lincoln NY, and Lincoln National Life were justifiably and lawfully increasing the COI charged to their universal life policies.

304.    Defendants falsely represented to the Plaintiffs, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing

costs. These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

305.  At the time Defendants made these statements, they knew them to be false.

306.  Defendants made these statements with the express intention of defrauding the Plaintiffs.

307.  Plaintiffs relied on Defendants' statements and were entitled to rely on such statements. In reliance on those statements, Plaintiffs continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

308.  Moreover, Plaintiffs relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

309.  Specifically, the COI increase has depleted the account value of Plaintiff N. Pace's and Plaintiff C. Pace's policy so drastically that they cannot afford the $1,317.52 required to keep the policy in force through January 2017. As a result, this policy is currently in a grace period and will likely lapse at the end of the month.

310.  If Defendants had not made such false statements, Plaintiffs would not have taken the above-described actions.

311.  As a result of the fraudulent actions and misrepresentations Lincoln National Corp., Lincoln National Life, Lincoln NY, Aetna, and Voya have taken, the Plaintiffs have suffered compensable injuries as stated above.

## COUNT SEVEN
## VIOLATION OF CONNECTICUT
## UNFAIR TRADE PRACTICES ACT
### (Against Voya, Lincoln NY, and Lincoln National Life)

312. Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

313. The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.,* prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

314. Voya, Lincoln NY, and Lincoln National Life are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

315. Voya, and Lincoln NY and Lincoln National Life as agents of Voya, engaged in unfair business practices in violation of the Connecticut Unfair Trade Practices Act as described herein, by, among other things, unfairly increasing Plaintiffs' COI and providing Plaintiffs with deceptive information regarding the reasons for the increase.  Voya, Lincoln NY, and Lincoln National Life are now taking Plaintiffs' Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiffs to purchase the policies in the first place.

316. Additionally, Voya, Lincoln NY, and Lincoln National Life falsely represented to the Plaintiffs, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs.  These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

317. Voya, Lincoln NY, and Lincoln National Life unfairly increased Plaintiffs' COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they

will be able to pay additional exorbitant dividends—material facts which they concealed from Plaintiffs.

318.    Voya, Lincoln NY, and Lincoln National Life knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders. Additionally, Voya, Lincoln NY, and Lincoln National Life knew that the "elevated costs," which they told Plaintiffs were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to their agents and brokers.  Voya's, Lincoln NY's and Lincoln National Life's reinsurance costs are figures wholly manipulated by Voya, Lincoln NY, and Lincoln, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Voya, Lincoln NY, and Lincoln National Life knew that they were not financially stable companies nor were they operating efficiently.

319.    Voya, Lincoln NY, and Lincoln National Life instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs of the increase.  They led Plaintiffs to believe that this was a justifiable increase, based on sound financial information.

320.    Voya, Lincoln NY, and Lincoln National Life thus violated the Connecticut Unfair Trade Practices Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the COI increase on the policies at issue.

321.    The decisions, acts, misrepresentations, concealment, and schemes violating the Connecticut Unfair Trade Practices Act by Voya, Lincoln NY, and Lincoln National Life emanated from Voya's headquarters in Connecticut and affected Plaintiffs.

322.    Voya, Lincoln NY, and Lincoln National Life knew or should have known that their conduct violated the Connecticut Unfair Trade Practices Act.

323.    Plaintiffs reasonably expected Voya, Lincoln NY, and Lincoln National Life to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

324.    As described herein, Plaintiffs relied on Voya's, Lincoln NY's, and Lincoln National Life's statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiffs continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

325.    Moreover, Plaintiffs relied on Voya's, Lincoln NY's, and Lincoln National Life's statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

326.    As such, Voya's, Lincoln NY's and Lincoln National Life's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

327.    Voya's, Lincoln NY's, and Lincoln National Life's conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.  Thus, Voya's, Lincoln NY's, and Lincoln National Life's unfair and deceptive increasing of Plaintiffs' COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

328.    Voya's, Lincoln NY's, and Lincoln National Life's conduct caused substantial injury to Plaintiffs.

329.    As a direct and proximate result of Voya's, Lincoln NY's, and Lincoln National Life's unfair and unlawful practices, Plaintiffs have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

### COUNT EIGHT
### VIOLATION OF NEW YORK
### DECEPTIVE ACTS AND PRACTICES ACT
#### (Against Voya Financial and Lincoln NY)

330.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

331.    New York General Business Law Section 349, the New York Deceptive Acts and Practices Act, makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.  Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

332.    Plaintiffs, Voya Financial, and Lincoln NY are "persons' under New York General Business Law Section 349(h).

333.    Voya Financial's and Lincoln NY's actions as set forth herein occurred in the conduct of trade or commerce under the New York Deceptive Acts and Practices Act.

334.    Voya Financial, and Lincoln NY engaged in unfair business practices in violation of the New York Deceptive Acts and Practices Act as described herein, by, among other things, unfairly increasing Plaintiffs' COI and providing Plaintiffs with deceptive information regarding the reasons for the increase.  Voya Financial and Lincoln NY are now taking Plaintiffs' Account Values, to benefit themselves and recoup their own losses, when they had originally used the

ability to increase savings and take policy loans as a selling point to induce Plaintiffs to purchase the policies in the first place.

335.    Lincoln NY unfairly increased Plaintiffs' COI rates by 15-55%, in order to recoup its prior losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial and Lincoln National Corp.—material facts which they concealed from Plaintiffs.

336.    Voya Financial and Lincoln NY knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders.  Additionally, Voya Financial and Lincoln NY knew that the "elevated costs," which they told Plaintiffs were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to their agents and brokers.  Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Voya Financial and Lincoln NY knew that they were not financially stable companies nor were they operating efficiently.

337.    Voya Financial and Lincoln NY instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs of the increase.  They led Plaintiffs to believe that this was a justifiable increase, based on sound financial information.

338.    Voya Financial and Lincoln NY knew or should have known that their conduct violated the New York Deceptive Acts and Practices Act.

339.    Voya Financial and Lincoln NY thus violated the New York Deceptive Acts and Practices Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the COI increase implemented on the policies at issue.

340.    The decisions, acts, misrepresentations, concealment, and schemes violating the New York Deceptive Trade Acts and Practices Act by Voya Financial and Lincoln NY emanated from Voya Financial's and Lincoln NY's respective headquarters in New York and affected Plaintiffs.

341.    Plaintiffs reasonably expected Voya Financial and Lincoln NY to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

342.    As described herein, Plaintiffs relied on Voya Financial's and Lincoln NY's statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiffs continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

343.    Moreover, Plaintiffs relied on Voya Financial's and Lincoln NY's statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

344.    As such, Voya Financial's and Lincoln NY's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

345.    Voya Financial's and Lincoln NY's conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.  Thus, Voya Financial's and Lincoln NY's unfair and deceptive increasing of Plaintiffs' COI to recoup

their own losses due to their captive insurance scheme and/or pay shareholder dividends has great

public impact, as described above, and it is in the public's interest to remedy this action.

346.    Voya Financial's and Lincoln NY's conduct caused substantial injury to Plaintiffs.

347.    As a direct and proximate result of Voya Financial's and Lincoln NY's unfair and

unlawful practices, Plaintiffs have suffered and will continue to suffer injury and ascertainable

losses of money and property and are entitled to damages in an amount to be proven at trial,

including punitive damages, and costs and reasonable attorneys' fees.

**COUNT NINE**
**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(Against all Defendants on behalf of Plaintiff Large-Gurin)**

348.    Plaintiffs repeat and reallege all allegations contained in Sections I through V

above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

349.    The Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*,

makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense,

misrepresentation, unfair practice, or the concealment, suppression, or omission of any material

fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ."

Mo. Rev. Stat. § 407.20.

350.    Plaintiff Large-Gurin is a "person" within the meaning of Missouri Revised Statute

Section 407.010(5).

351.    The policies at issue are "merchandise" within the meaning of Missouri Revised

Section 407.010(4), which includes "intangibles" and "services."  Additionally, the definition of

"trade or commerce" also encompasses the sale, offer to sell, and distribution of life insurance

policies, as they are both services and intangible property.  Mo. Rev. Stat.  § 407.010(7).

352.    Defendants engaged in unfair business practices in violation of the Missouri

Merchandising Practices Act as described herein, by, among other things, unfairly increasing

75

Plaintiff Large-Gurin's COI and providing Plaintiff Large-Gurin with deceptive information regarding the reasons for the increase. Defendants are now taking Plaintiff Large-Gurin's Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiff Large-Gurin to purchase the policies in the first place.

353.    Additionally, Defendants falsely represented to Plaintiff Large-Gurin, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs. These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

354.    Defendants unfairly increased Plaintiff Large-Gurin's COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they will be able to pay additional exorbitant dividends—material facts which they concealed from Plaintiff Large-Gurin.

355.    Defendants knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders. Additionally, Defendants knew that the "elevated costs," which they told Plaintiff Large-Gurin were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to their agents and brokers. Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies. Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

356.    Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiff Large-Gurin of the increase. They led Plaintiff Large-Gurin to believe that this was a justifiable increase, based on sound financial information.

357.     Defendants thus violated the Missouri Merchandise Trade Practices Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement, sale, and administration—including the COI increase—of the policies at issue.

358.     Defendants knew or should have known that their conduct violated the Missouri Merchandising Practices Act.

359.     Plaintiff Large-Gurin reasonably expected Defendants to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

360.     As described herein, Plaintiff Large-Gurin relied on Defendants' statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiff Large-Gurin continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

361.     Moreover, Plaintiff Large-Gurin relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

362.     As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiff Large-Gurin.

363.     Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes

substantial injury to consumers, competitors, or other businesses.  Thus, Defendants' unfair and deceptive increasing of Plaintiff Large Gurin's COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

364.    Defendants' conduct caused substantial injury to Plaintiff Large-Gurin.

365.    As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiff Large-Gurin have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

## COUNT TEN
### VIOLATION OF NORTH CAROLINA UNFAIR
### AND DECEPTIVE TRADE PRACTICES ACT
### (Against all Defendants on behalf of Plaintiffs N. Pace and C. Pace)

366.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

367.    The North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*, makes unlawful the "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The North Carolina Deceptive Trade Practices Act provides a right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the Act.  N.C. Gen. Stat. § 75-16.

368.    Plaintiffs N. Pace and C. Pace are "persons" under the North Carolina Deceptive Trade Practices Act, N.C. Gen Stat. §§ 75-1.1, *et seq.*

369.    Defendants acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred or affected "commerce" as defined in N.C. Gen. Stat. § 75-1.1(b).

370.    Defendants engaged in unfair business practices in violation of the North Carolina Deceptive Trade Practices Act as described herein, by, among other things, unfairly increasing Plaintiffs N. Pace's and C. Pace's COI and providing Plaintiffs with deceptive information regarding the reasons for the increase.  Defendants are now taking Plaintiffs' Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiffs N. Pace and C. Pace to purchase the policies in the first place.

371.    Additionally, Defendants falsely represented to Plaintiffs N. Pace and C. Pace, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs.   These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

372.    Defendants unfairly increased Plaintiffs N. Pace's and C. Pace's COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they will be able to pay additional exorbitant dividends—material facts which they concealed from Plaintiffs N. Pace and C. Pace.

373.    Defendants knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders.  Additionally, Defendants knew that the "elevated costs," which they told Plaintiffs N. Pace and C. Pace were the basis of the decision to raise COI rates, were actually higher ***reinsurance*** costs, a fact which was told to their agents and brokers.  Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

374.   Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs N. Pace and C. Pace.  They led Plaintiffs to believe that this was a justifiable increase, based on sound financial information.

375.   Defendants' conduct proves that they have acted in bad faith, and have violated the North Carolina Deceptive Trade Practices Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement, sale, and administration of the policies at issue.

376.   Defendants knew or should have known that their conduct violated the North Carolina Deceptive Trade Practices Act.

377.   Plaintiffs N. Pace and C. Pace reasonably expected Defendants to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

378.   As described herein, Plaintiffs N. Pace and C. Pace relied on Defendants' statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiffs continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

379.   Moreover, Plaintiffs N. Pace and C. Pace relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

380.   As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiffs N. Pace and C. Pace.

381.     Furthermore, under the North Carolina Deceptive Trade Practices Act, a claim may be founded on, among other things, a *per se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest.

382.     Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

383.     Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Defendants' unfair and deceptive increasing of Plaintiffs N. Pace's and C. Pace's COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

384.     Defendants' conduct caused substantial injury to Plaintiffs N. Pace and C. Pace.

385.     As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiffs N. Pace and C. Pace have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

## COUNT ELEVEN
## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (Against Lincoln National Corp.)

386.     Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

387.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §
201-1, *et seq.*, prohibits "unfair or deceptive acts or practices in the conduct of any trade or
commerce . . . ."  73 P.S. § 201-2(3).

388.     Plaintiffs, and Lincoln National Corp. are "persons" within the meaning of 73 P.S.
§ 201-2(2).

389.     Lincoln National Corp. is engaged in "trade" or "commerce" within the meaning
of 73 P.S. § 201-2(3).

390.     Lincoln National Corp. engaged in unfair business practices in violation of the
Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 as described
herein, by, among other things, unfairly causing Plaintiffs' COI to increase and providing Plaintiffs
with deceptive information regarding the reasons for the increase.  Lincoln National Corp. is now
taking Plaintiffs' Account Values, to benefit itself and its shareholders and recoup its own losses.
Lincoln National Corp. and its subsidiaries had originally used the ability to increase savings and
take policy loans as a selling point to induce Plaintiffs to purchase the policies in the first place.

391.     Additionally, Lincoln National Corp. falsely represented to the Plaintiffs, as stated
above, that it was a well-funded company, operating efficiently, increasing profits and cash flows,
and reducing costs.  These statements were made through direct policyholder communications,
through statements made on Lincoln National Corp.'s website, and through public financial
statements filed with governmental agencies.

392.     Lincoln National Corp. unfairly caused Plaintiffs' COI rates to increase by 15-55%,
in order to recoup its prior losses and generate more funds with which it will be able to pay
additional exorbitant dividends—material facts which it concealed from Plaintiffs.

393.     Lincoln National Corp. knew that the COI increase was a means to recoup its losses
and generate more funds with which it will be able to pay additional exorbitant dividends to its

shareholders.  Additionally, Lincoln National Corp. knew that the "elevated costs," which it told Plaintiffs were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to Lincoln agents and brokers.  Lincoln National Corp. reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Lincoln National Corp. knew that it was not a financially stable company nor was it operating efficiently.

394.    Lincoln National Corp. instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs of the increase.  It led Plaintiffs to believe that this was a justifiable increase, based on sound financial information.

395.    Lincoln National Corp. thus violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the COI increase on the policies at issue.

396.    Lincoln National Corp. knew or should have known that its conduct violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

397.    Plaintiffs reasonably expected Lincoln National Corp. to ensure that its COI charges were fairly calculated and implemented based solely upon sound financial reasoning.

398.    As described herein, Plaintiffs relied on Defendants' statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiffs continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

399.     Moreover, Plaintiffs relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

400.     As such, Lincoln National Corp.'s unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

401.     Furthermore, under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, a claim may be founded on, among other things, a *per se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest.  *See Gabriel v. O'Hara*, 534 A.2d 488 (Pa. 1987).

402.     Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*. Lincoln National Corp.'s conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Lincoln National Corp.'s unfair and deceptive increasing of Plaintiffs' COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

403.     Lincoln National Corp.'s conduct caused substantial injury to Plaintiffs.

404.     As a direct and proximate result of Lincoln National Corp.'s unfair and unlawful practices, Plaintiffs have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

## **COUNT TWELVE**

## VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT
### (Against all Defendants on behalf of Plaintiff Swenson)

405.     Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

406.     The Washington Consumer Protection Act, Wash. Rev. Code § 19.86, *et seq.*, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

407.     Plaintiff Swenson, and Defendants are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

408.     Defendants are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

409.     Defendants engaged in unfair business practices in violation of the Washington Consumer Protection Act as described herein, by, among other things, unfairly increasing Plaintiff Swenson's COI and providing Plaintiff Swenson with deceptive information regarding the reasons for the increase. Defendants are now taking Plaintiff Swenson's Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiff Swenson to purchase the policies in the first place.

410.     Additionally, Defendants falsely represented to Plaintiff Swenson, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs. These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

411.    Defendants unfairly increased Plaintiff Swenson's COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they will be able to pay additional exorbitant dividends—material facts which they concealed from Plaintiff Swenson.

412.    Defendants knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders.  Additionally, Defendants knew that the "elevated costs," which they told Plaintiff Swenson were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to their agents and brokers. Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

413.    Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiff Swenson of the increase.  They led Plaintiff Swenson to believe that this was a justifiable increase, based on sound financial information.

414.    Defendants' conduct proves that they have acted in bad faith, and have violated the Washington Consumer Protection Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement, sale, and administration of the policies at issue.

415.    Defendants knew or should have known that their conduct violated the Washington Consumer Protection Act.

416.    Plaintiff Swenson reasonably expected Defendants to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

417.    As described herein, Plaintiff Swenson relied on Defendants' statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiff Swenson continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

418.    Moreover, Plaintiff Swenson relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

419.    As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiff Swenson.

420.    Furthermore, under the Washington Consumer Protection Act, a claim may be founded on, among other things, a *per se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest.

421.    Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86, *et seq*.

422.    Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Defendants' unfair and deceptive increasing of Plaintiff Swenson's COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

423.    Defendants' conduct caused substantial injury to Plaintiff Swenson.

424.    As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiff Swenson have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

**COUNT THIRTEEN**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**(Against all Defendants on behalf of Plaintiffs Harris and Reed as trustees for the Harris Trust and Mackie as trustee for Trust UTD 12/28/1993)**

425.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

426.    The California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.*, makes unlawful unfair competition, defined as, "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act."  The California Unfair Competition Law provides a right of action for any person injured by "[a]ny person who engages, has engaged, or proposes to engage in unfair competition." Cal. Bus. & Prof. Code §§ 17203; 17204.

427.    Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 and Defendants are "persons" under the California Unfair Competition Law. Cal. Bus. & Prof. Code § 17201.

428.    Defendants acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred or affected "unfair competition" as defined in Cal. Bus. & Prof. Code § 17200.

429.    Defendants engaged in unfair business practices in violation of the California Unfair Competition Law as described herein, by, among other things, unfairly increasing Plaintiffs

Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 COI and providing Plaintiffs with deceptive information regarding the reasons for the increase. Defendants are now taking Plaintiffs' Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 to purchase the policies in the first place.

430.    Additionally, Defendants falsely represented to Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs. These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

431.    Defendants unfairly increased Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they will be able to pay additional exorbitant dividends—material facts which they concealed from Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993.

432.    Defendants knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders. Additionally, Defendants knew that the "elevated costs," which they told Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to their agents and brokers. Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive

89

reinsurers, are reinsuring the policies.  Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

433.    Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993.  They led Plaintiffs to believe that this was a justifiable increase, based on sound financial information.

434.    Defendants' conduct proves that they have acted in bad faith, and have violated the California Unfair Competition Law by, at a minimum: unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising, employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement, sale, and administration of the policies at issue.

435.    Defendants knew or should have known that their conduct violated the California Unfair Competition Law.

436.    Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 reasonably expected Defendants to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

437.    As described herein, Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 relied on Defendants' statements and were entitled to rely on such statements. In reliance on those statements, Plaintiffs continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

438.    Moreover, Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

439.    As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993.

440.    Furthermore, under the California Unfair Competition Law, a claim may be founded on, among other things, a *per se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest.

441.    Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the California Unfair Competition Law.

442.    Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Defendants' unfair and deceptive increasing of Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

443.    Defendants' conduct caused substantial injury to Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993.

444.    As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993 have suffered and

will continue to suffer injury and ascertainable losses of money and property and are entitled to restitution in an amount to be proven at trial, injunctive relief, and costs and reasonable attorneys' fees.

**COUNT FOURTEEN**
**VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES-**
**CONSUMER PROTECTION ACT**
**(Against all Defendants on behalf of Plaintiff Wheeler)**

445.    Plaintiffs repeat and reallege all allegations contained in Sections I through V above, including paragraphs 1 to 268, as if set forth separately in this Claim for Relief.

446.    The Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.*, makes unlawful "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a). The Act provides a right of action for any person injured by "any unconscionable action or course of action by any person" or "the use or employment by any person of an act or practice in violation of Chapter 541, Insurance Code." Tex. Bus. & Com. Code § 17.50(a)(3), (4).

447.    Plaintiff Wheeler and Defendants are "persons" under the Act. Tex. Bus. & Com. Code § 17.45(3).

448.    Defendants acts and practices complained of herein were performed in the course of Defendants' business and thus occurred or affected "trade" "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6).

449.    Plaintiff provided notice sixty days prior to filing of her claim as required under the Act. Tex. Bus. & Com. Code § 17.505(a). Defendants requested a copy of information related to her complaint and she provided a copy of her policy as the "the goods that are the subject of the consumer's action or claim may be presented to the consumer." *Id.* Despite requesting this

information, Defendants represented in their same request for information that they "unequivocally deny" Plaintiff's complaint as articulated in her notice.

450. Defendants engaged in unconscionable acts or practices in violation of the Act as described herein, by, among other things, unfairly increasing Plaintiff Wheeler's COI and providing Plaintiff with deceptive information regarding the reasons for the increase. Defendants are now taking Plaintiff's Account Value, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiff Wheeler to purchase the policies in the first place.

451. Additionally, Defendants falsely represented to Plaintiff Wheeler, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs. These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

452. Defendants unfairly increased Plaintiff Wheeler's COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they will be able to pay additional exorbitant dividends—material facts which they concealed from Plaintiffs Harris, Reed, the Harris Trust, Mackie and the Trust UTD 12/28/1993.

453. Defendants knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders. Additionally, Defendants knew that the "elevated costs," which they told Plaintiff Wheeler were the basis of the decision to raise COI rates, were actually higher *reinsurance* costs, a fact which was told to their agents and brokers. Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves,

through captive reinsurers, are reinsuring the policies.  Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

454.    Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiff Wheeler.  They led Plaintiff to believe that this was a justifiable increase, based on sound financial information.

455.    Defendants' conduct proves that they have acted in bad faith, and have violated the Act by, at a minimum: unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising, employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement, sale, and administration of the policies at issue.

456.    Defendants knew or should have known that their conduct violated the Texas Deceptive Trade Practices-Consumer Protection Act.

457.    Plaintiff Wheeler reasonably expected Defendants to fairly calculate her COI charges, and implement them based solely upon sound financial reasoning.

458.    As described herein, Plaintiff Wheeler relied on Defendants' statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiff continued to pay premiums and excess premiums long after she otherwise would have; additionally, Plaintiff did not attempt to obtain an alternative life insurance policy at an earlier date when she either could have obtained one or more and/or could have obtained them at a lesser charge than she can now.

459.    Moreover, Plaintiff Wheeler relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from her policies' cash value.

460.    As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiff Wheeler.

461.    Furthermore, under the Act, a claim may be founded on, among other things, a *per se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest.

462.    Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the Act.

463.    Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Defendants' unfair and deceptive increasing of Plaintiff Wheeler's COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

464.    Defendants' conduct caused substantial injury to Plaintiff Wheeler.

465.    As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiff Wheeler has suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A.    Awarding Plaintiffs compensatory damages, trebled, in an amount to be determined at trial;

B.    Awarding Plaintiffs restitution damages in an amount to be determined at trial;

C.      Punitive Damages;

D.      Awarding Plaintiffs declaratory and injunctive relief;

E.      Awarding Plaintiffs attorneys' fees and costs; and

F.      Affording Plaintiffs with such further and other relief as deemed just and proper by

the Court.

## VIII.  JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by right by jury.

RESPECTFULLY SUBMITTED AND DATED this 3rd day of October, 2017.

By: */s/ Andrew E. Brashier_____*

W. Daniel "Dee" Miles, III, *Pro Hac Vice*
Andrew E. Brashier, *Pro Hac Vice*
Rachel N. Boyd, *Pro Hac Vice*
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
272 Commerce Street
Post Office Box 4160 (36103)
Montgomery, Alabama 36104
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
Email: dee.miles@beasleyallen.com
Email: andrew.brashier@beasleyallen.com
Email: rachel.boyd@beasleyallen.com

Geoffrey R. McDonald, *Pro Hac Vice Anticipated*
Justin M. Sheldon, *Pro Hac Vice Anticipated*
Frank H. Hupfl, III, *Pro Hac Vice Anticipated*
GEOFF MCDONALD & ASSOCIATES, P.C.
3315 West Broad Street
Richmond, Virginia 23230
Telephone: (804) 888-8888
Facsimile: (804) 359-5426
Email: gmcdonald@mcdonaldinjurylaw.com
Email: jsheldon@mcdonaldinjurylaw.com
Email: fhupfl@mcdonaldinjurylaw.com

Charles Crueger, *Pro Hac Vice Anticipated*
Erin Dickinson, *Pro Hac Vice Anticipated*
CRUEGER DICKINSON LLC
4532 N. Oakland Ave.

Whitefish Bay, Wisconsin 53202
Telephone: (414) 210-3900
Facsimile: (414) 273-8476
Email: cjc@cruegerdickinson.com
Email: ekd@cruegerdickinson.com

Samuel J. Strauss, *Pro Hac Vice Anticipated*
TURKE & STRAUSS PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (608) 237-1774
Facsimile: (608) 259-9114
Email: sam@turkestrauss.com

Stephen Fearon
Raymond Barto
Squitieri & Fearon LLP
32 East 57th Street
New York, NY 10022
Tel: 212-421-6492
Fax: 212-421-6553
Email: stephen@sfclass.com
Email: raymond@sfclass.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Mr. Alan Borden Vickery, Esq.
Mr. Jack G. Stern, Esq.
Mr. John Francis LaSalle, Esq.
**Boies Schiller Flexner, LLP**
575 Lexington Ave
7th Floor
New York, NY 10022
Telephone: (212) 446-2345
avickery@bsfllp.com
jstern@bsfllp.com
jlasalle@bsfllp.com

Mr. Motty Shulman, Esq.
**Boies Schiller Flexner, LLP**
333 Main Street
Armonk, NY 10504
Phone: 914-749-8200
Fax: 914-749-8300
mshulman@bsfllp.com

Mr. Sean P. Rodriguez
**Boies, Schiller, Flexner, LLP**
1999 Harrison Street, Suite 900
Oakland, California 94568
srodriguez@bsfllp.com

Mr. Brendan V. Monahan
Mr. Jaime Cuevas, Jr.
**Stokes, Lawrence, Velikanje, Moore & Shore**
120 North Naches Avenue
Yakima, WA 98901-2757
Phone: 509-853-3000
Fax: 509-895-0060
bvm@stokeslaw.com
jcj@stokeslaw.com

DATED this 3rd day of October, 2017.

By: */s/ Andrew E. Brashier*